REVISED SEPTEMBER 24, 2002

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 00-40557

_____


DEAN KINNEY; DAVID HALL

                              Plaintiffs - Appellees

     v.


BOBBY WEAVER, Etc.; ET AL

                              Defendants

J B SMITH, Smith County Sheriff; SMITH COUNTY TEXAS; W A
"BILL" YOUNG, Tyler Police Chief; CITY OF TYLER, TEXAS; EAST
TEXAS POLICE CHIEF'S ASSOCIATION; BOBBY WEAVER, Gregg County
Sheriff; BOB GREEN, Harrison County Sheriff; GREGG COUNTY
TEXAS; HARRISON COUNTY TEXAS; RONNIE MOORE, Kilgore Director
of Public Safety; CHARLES "CHUCK" WILLIAMS, City of Marshall
Police Chief; TED GIBSON, Nacogdoches Police Chief; CITY OF
KILGORE, TEXAS; CITY OF MARSHALL TEXAS; CITY OF NACOGDOCHES
TEXAS

                              Defendants - Appellants

_____

Appeals from the United States District Court
for the Eastern District of Texas, Lufkin
_____

July 31, 2002

Before KING, Chief Judge, BARKSDALE, Circuit Judge, and SCHELL,
District Judge.[*]

KING, Chief Judge:


_____

     [*] District Judge of the Eastern District of Texas, sitting
by designation.

Plaintiffs-Appellees Dean Kinney and David Hall brought suit against seven law enforcement officials, the seven cities or counties that employ these officials, and the East Texas Police Chiefs' Association,[1] asserting four claims: (1) a 42 U.S.C. § 1985(2) claim alleging conspiracy against Kinney and Hall because of their testimony in judicial proceedings, (2) a 42 U.S.C. § 1983 claim alleging violations of their rights to freedom of speech under the First and Fourteenth Amendments, (3) a § 1983 claim alleging violations of their Fourteenth Amendment rights to due process of law, and (4) a state law claim alleging tortious interference with business relations. The law enforcement officials now appeal the district court's order denying their summary judgment motion that asserted qualified immunity against the federal claims and state-law immunity against the tort claim. For the following reasons, we AFFIRM the district court's order holding that the law enforcement officials are not entitled to qualified immunity against the § 1985 claim or the § 1983 First Amendment claim, or to state-law immunity against the tort claim, and we REVERSE that court's order holding that those officials do not have qualified immunity against the § 1983 due process claim.

## I. FACTUAL AND PROCEDURAL BACKGROUND

---

[1] Originally, Kinney and Hall named an eighth official and his agency of employment as defendants, but the district court granted a subsequent agreed motion to dismiss Kinney and Hall's complaint against these two parties.

Viewing the summary judgment record in the light most favorable to the non-moving parties, i.e., Dean Kinney and David Hall, the facts are as follows. See Kemp v. G.D. Searle & Co., 103 F.3d 405, 406 (5th Cir. 1997) (setting out the facts in the light most favorable to the non-moving party in reviewing a summary judgment). At the time of the events giving rise to their claims in the instant case, Kinney and Hall were instructors at the East Texas Police Academy ("ETPA"), a division of Kilgore College in Kilgore, Texas. Founded by the East Texas Police Chiefs' Association in 1966, the ETPA provides basic and advanced training for law enforcement officers in the greater East Texas area. At the time of the events giving rise to the instant case, Kinney and Hall had been working at the ETPA for seventeen years and six years, respectively, under renewable one-year employment contracts. The law enforcement officials asserting qualified immunity in this case are chiefs of police or sheriffs who possess final authority over the training of the officers employed by their respective agencies (collectively "the Police Chiefs and Sheriffs"). Before the fall of 1998, the Police Chiefs and Sheriffs enrolled their officers in ETPA courses on a regular basis, including courses taught by Kinney and Hall.

In August 1998, Kinney and Hall testified as expert witnesses for the family of Edward Gonzales, a seventeen-year-old who was fatally shot by a police officer employed by the city of

3

Kerrville ("the Kerrville case").[2] Based on their knowledge and experience as law enforcement instructors specializing in the use of force and firearms, Kinney and Hall testified that the Kerrville police officer had used excessive force and that the Kerrville police department had failed to implement the proper policies necessary to direct the conduct of officers acting as "snipers." Although Kinney and Hall made fee arrangements with the attorney who represented Gonzales's family in their wrongful death action against the officer and the city, Kinney and Hall decided shortly after they were deposed that they would decline payment. Kinney's explanation for this decision, confirmed by Hall, is that the two "felt so strongly about the incident and what had happened to Eddie Gonzales" that they concluded that "it wouldn't be right to charge."

Shortly after Kinney and Hall testified in the Kerrville case, William Holda, the president of Kilgore College, received letters from some of the Police Chiefs and Sheriffs denouncing Kinney's and Hall's expert testimony for the Kerrville case plaintiffs and threatening to stop using the ETPA for officer training. In a letter dated September 15, 1998, Kilgore Director of Public Safety Ronnie Moore[3] told Holda that he was concerned

---

[2] The Kerrville case did not involve an officer who had been trained at the ETPA or a law enforcement agency that sent students to the ETPA, as Kerrville lies outside the region of Texas from which the ETPA draws its students.

[3] As director of public safety for the city of Kilgore, Moore supervised the city's police and fire departments.

4

about Kinney's and Hall's recent inquiries regarding a case initiated by Kilgore's police department because "[i]t is a well known fact within this agency that these instructors had previously testified in another matter, against other Officers." Moore informed Holda that "[d]ue to these circumstances, our agency will be exploring other options to provide the professional training necessary for our Officers." In a letter dated September 29, 1998, Charles Williams, the chief of the city of Marshall's police department, also complained to Holda about Kinney's and Hall's expert testimony. Specifically, he wrote, "I think it is deplorable . . . that instructors for our Police Academy hire themselves out as an expert witness: _**AGAINST**_ law enforcement agencies" (emphasis in original). Williams stated further that "[t]he Marshall Police Department will not attend any courses taught by Mr. David Hall or Mr. Dean Kinney due to the liability they place on this Police Department." Williams attached three newspaper articles that mentioned Kinney's and Hall's roles as expert witnesses for the plaintiffs in the Kerrville case.

The summary judgment evidence submitted by Kinney and Hall includes Williams's deposition, in which he testified that he learned of Kinney's and Hall's involvement in the Kerrville case when he received an envelope from an anonymous source containing the three newspaper articles that Williams attached to his letter

5

to Holda. In addition to the articles, the envelope contained a note telling Williams to contact Moore for more information, which Williams did shortly after receiving the envelope. Williams forwarded copies of his September 29, 1998 letter and the attached articles to Moore and four of the other Police Chiefs and Sheriffs, namely, Bill Young, the chief of police for the city of Tyler, Bob Green, the sheriff of Harrison County, Bobby Weaver, the sheriff of Gregg County, and J.B. Smith, the sheriff of Smith County. The set of documents that Williams forwarded to Young, which is in the summary judgment record, also included a copy of Moore's September 15 letter to Holda.

Young sent a letter to Holda on September 30, 1998, the day after he received the letters and articles from Williams. Young wrote, "I am greatly disturbed by the recent news that [David Hall and Dean Kinney] have acted in the capacity of 'Expert Witnesses' to testify against another law enforcement agency and it's [sic] officers." He emphasized he was "voic[ing] [his] concern, not only as Chief of Police of an agency that is one of your largest customers, but also as President of the East Texas Police Chiefs' Association." Noting that "[i]t is not our preference to have these two instructors teach our officers and also engage in legal combat with them in the judicial system," Young stated that "[t]his matter will force us to consider alternative methods to achieve our training needs if not resolved as soon as possible."

In an attempt to address these complaints, Holda met with Moore, Williams, and Young on September 30, 1998. Also in attendance were three other law enforcement officers to whom Williams had forwarded copies of his letter to Holda, including Defendant Green. In his affidavit, Holda gave an account of this meeting that was largely confirmed by Moore, Williams, Young, and Green in their depositions. According to Holda, all four men "made it clear" (1) "that it was unacceptable for Mr. Hall and Mr. Kinney to continue as instructors of officers and recruits and also testify in litigation against police officers," and (2) "that they would no longer send officers and recruits to the [ETPA] for training if Mr. Hall and Mr. Kinney remained on the Academy faculty." Moore, Williams, and Green subsequently agreed to use the ETPA on the condition that their officers would not be instructed by Kinney and Hall, but Young continued to insist that Kinney and Hall be removed from the ETPA faculty.

Shortly after the September 30 meeting, Holda met with Kinney and Hall to apprise them of the Police Chiefs' and Sheriffs' condemnation of Kinney's and Hall's work in the Kerrville case. Kinney and Hall assured Holda that they would never testify as experts against any officer who had been trained at the ETPA or any agency that had sent officers to the ETPA for training.[4] Kinney further promised that he would not accept

---

[4] Kinney and Hall made clear, however, that if compelled to testify in a case involving an officer whom they had trained at the ETPA, they would testify truthfully as to whether the officer

7

payment for any future work on behalf of plaintiffs in police misconduct cases.  In a letter dated October 5, 1998, Holda conveyed Kinney's and Hall's assurances to the attendees of the September 30 meeting and invited them to attend another meeting along with other East Texas law enforcement officials for the purpose of discussing their concerns directly with Kinney and Hall.  None of the invitees indicated an interest in such a meeting or came to the ETPA on the date suggested by Holda.

On October 22, 1998, the East Texas Police Chiefs' Association held its quarterly meeting in Kilgore.  The attendance was unusually large.  All of the Police Chiefs and Sheriffs were present.[5]  The minutes of this meeting reflect that Kinney's and Hall's involvement in the Kerrville case was prominent on the agenda.  Defendants Young (who was president of the East Texas Police Chiefs' Association at the time), Williams, Moore, Gibson, and Weaver stood up and voiced their disapproval of Kinney's and Hall's work on behalf of the plaintiffs in the Kerrville case, and all five officials stated their intention to ensure that their officers were not trained by Kinney or Hall.  Subsequently, the minutes state that "it was agreed that none of the Chiefs or Sheriffs present would send their officers to any classes taught by either [Kinney or Hall]."

---

had acted in accordance with their training.

[5]  Smith did not personally attend, but rather sent a representative.

8

A number of local media organizations reported on the controversy that arose out of Kinney's and Hall's expert testimony against a law enforcement officer and agency. On television and in print, Defendants Young, Weaver, Williams, and Smith are documented announcing their intention either to bar their officers from taking Kinney's and Hall's courses or to use a training institution other than the ETPA. Smith was quoted as stating that Kinney and Hall "prostituted themselves . . . in a case that did not involve them and that's wrong." Weaver told a television reporter that Kinney and Hall had violated "an unwritten code."

The Police Chiefs and Sheriffs followed through on their threat to boycott Kinney's and Hall's courses by both cancelling current enrollment and disallowing future enrollment of their officers in Kinney's and Hall's courses. The summary judgment evidence indicates that this boycott was quite effective. Holda stated that Kinney's and Hall's courses "were boycotted by a sufficient number of law enforcement agencies so that enrollment was insufficient to make their classes and, therefore, could not be economically continued." The boycott began in October 1998, and by November 10, 1998, all of Kinney's and Hall's basic classes had been removed from the schedule, and many of their off-campus classes had been cancelled.

Aware that the enrollment in his courses was down and thus anticipating that his ETPA contract would not be renewed at the

end of the 1998-1999 academic year, Hall resigned from the ETPA on January 3, 1999, because he was concerned that he would not be able to support his family if his compensation was substantially decreased. He was hired as a patrol officer at the Carrollton Police Department, the job he had left to work at the ETPA six years earlier.

Kinney continued working as an ETPA instructor until his contract for the 1998-1999 academic year expired on August 31, 1999. During this period, the boycott remained in effect. The ETPA double-booked all Kinney's classes on the 1999 schedule to ensure that the law enforcement agencies that refused to enroll their officers in Kinney's courses would have alternatives at the ETPA. Kinney stated in his affidavit that he "had minimal class time during the first few months of the 1999 calendar year" —— specifically, he "had no time in the basic police academy and very little in the in-service classes." In their depositions taken on August 24, 25, and 26, 1999, the Police Chiefs and Sheriffs stated that they continued to prohibit enrollment either in Kinney's courses or in all ETPA courses because Kinney remained on the ETPA faculty. Kilgore College did not renew Kinney's 1998-1999 contract for his position as an ETPA instructor, but rather offered him a contract for a lecturer position in the Criminal Justice Department of Kilgore College for the following 1999-2000 academic year. The salary for this position was $15,000 less than Kinney earned as an ETPA

10

instructor.  He had not taught in the Criminal Justice Department previously, but rather had been an ETPA instructor for the entire seventeen-year period that he had been working for Kilgore College.  According to Holda, "Kilgore College did not anticipate a change in the teaching assignment for either Mr. Kinney or Mr. Hall prior to the decisions by certain law enforcement agencies to boycott classes taught by Mr. Hall and Mr. Kinney."

On April 7, 1999, Kinney and Hall filed a complaint in federal district court against the Police Chiefs and Sheriffs, their respective cities or counties of employment, and the East Texas Police Chiefs' Association, alleging that the defendants had "blackballed" Kinney and Hall "in retaliation for their truthful testimony on behalf of the victim of a police shooting." Kinney and Hall claimed that in taking such action, the defendants had violated: (1) their rights to testify freely under 42 U.S.C. § 1985(2), (2) their rights to free speech under the First and Fourteenth Amendments, (3) their rights to due process of law under the Fourteenth Amendment, and (4) Texas law.  The defendants (both the law enforcement officials and the entities) moved for summary judgment on the merits of all four claims, and the Police Chiefs and Sheriffs also asserted qualified and state law immunity defenses.  The district court denied the defendants' summary judgment motion on all grounds.  Kinney v. Weaver, 111 F. Supp. 2d 831 (E.D. Tex. 2000).  The Police Chiefs and Sheriffs

11

now appeal the district court's denial of summary judgment on their qualified and state law immunity defenses.

## II.  JURISDICTION OVER AN INTERLOCUTORY APPEAL OF A DISTRICT COURT'S DENIAL OF QUALIFIED IMMUNITY

We must first address our jurisdiction to hear the Police Chiefs' and Sheriffs' interlocutory appeals.  Under the collateral-order doctrine, a denial of summary judgment based on qualified immunity is immediately appealable as a "final decision" under 28 U.S.C. § 1291 (1994)[6] "to the extent that [such a denial] turns on an issue of law."  Mitchell v. Forsyth, 472 U.S. 511, 530 (1985).  To deny a summary judgment motion based on qualified immunity, a district court must determine both (1) that certain conduct "violate[d] clearly established statutory or constitutional rights of which a reasonable person would have known," Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982), and (2) that a genuine issue of fact exists regarding whether the defendant engaged in such conduct.  See Colston v. Barnhart, 146 F.3d 282, 284 (5th Cir. 1998) (on petition for rehearing en banc).  The latter conclusion is not immediately appealable, as "such conclusions are nothing more than a determination of the sufficiency of the evidence — a finding which, in turn, is not truly separable from the underlying claim and thus is not a 'final order' under the collateral order

---

[6]  Section 1291 provides that "[t]he courts of appeals . . . shall have jurisdiction of appeals from all final decisions of the district courts of the United States."  28 U.S.C. § 1291.

12

doctrine." Lemoine v. New Horizons Ranch & Ctr., Inc., 174 F.3d 629, 634 (5th Cir. 1999); see also Johnson v. Jones, 515 U.S. 304, 313 (1995) (holding that "the District Court's determination that the summary judgment record in this case raised a genuine issue of fact concerning [whether the officials engaged in the conduct alleged by the plaintiff] was not a 'final decision within the meaning of [28 U.S.C. § 1291]"). Rather, on interlocutory appeal we may review only the purely legal question whether the plaintiff alleges a violation of a clearly established right of which a reasonable person would have known. See Johnson, 515 U.S. at 313, 319; Mitchell, 472 U.S. at 528 n.9. Accordingly, "we can review the materiality of any factual disputes, but not their genuineness." Wagner v. Bay City, 227 F.3d 316, 320 (5th Cir. 2000). "In making this legal determination on the materiality of the facts at issue, we review the complaint and record to determine whether, assuming that [the plaintiff's version of the facts is] true, those facts are materially sufficient to establish that [the] defendants acted in an objectively unreasonable manner [in light of clearly established law]." Chiu v. Plano Indep. Sch. Dist., 260 F.3d 330, 341 (5th Cir. 2001) (citation and internal quotations omitted).

Kinney and Hall assert that we are without jurisdiction to consider an interlocutory appeal of the district court's order denying qualified immunity because the court based that order on

13

its determination that genuine issues of fact exist as to whether the Police Chiefs and Sheriffs boycotted Kinney's and Hall's courses in retaliation for their truthful testimony in the Kerrville case.  However, the district court's denial of summary judgment was also based on the court's conclusion that such a boycott violated Kinney's and Hall's clearly established rights.  See Kinney, 111 F. Supp. 2d at 837, 840-43.  The Supreme Court has made clear that appellate review of that conclusion is not precluded by the fact that the district court also determined that the record establishes genuine issues of fact as to whether the conduct in question occurred.  See Behrens v. Pelletier, 516 U.S. 299, 313 (1996) (reaffirming that a government official may "claim on appeal that all of the conduct which the District Court deemed sufficiently supported for purposes of summary judgment met the Harlow standard of 'objective legal reasonableness'").

As the Police Chiefs and Sheriffs point out, for purposes of this appeal, they do not challenge the district court's determination that there is a genuine issue of fact regarding whether they engaged in the conduct attributed to them by Kinney and Hall.  Rather, the Police Chiefs and Sheriffs challenge only that court's determination that such conduct was objectively unreasonable in light of law that was clearly established at the time of the alleged violations.  Thus, we have jurisdiction over

the Police Chiefs' and Sheriffs' interlocutory appeals of the district court's order denying them qualified immunity.[7]

## III. STANDARD OF REVIEW

We review de novo a district court's denial of a summary judgment motion, including those based on qualified immunity. Chiu, 260 F.3d at 342. As discussed above, we have jurisdiction to review interlocutory appeals from a denial of qualified immunity only to the extent that the denial turns on purely legal questions. Thus, we do not apply the same Rule 56(c) standard as the district court because we do not determine whether the record establishes genuine factual issues. Compare Wagner, 227 F.3d at 320 ("In deciding an interlocutory appeal of a denial of qualified immunity, we can review the materiality of any factual disputes, but not their genuineness."), with Walker v. Thompson, 214 F.3d 615, 624 (5th Cir. 2000) ("[S]ummary judgment will be affirmed only when [we are] convinced, after an independent

_____

[7] Although the briefs submitted by both parties in this case address only the issue whether the district court properly denied the Police Chiefs' and Sheriffs' claims of qualified immunity in their summary judgment motion, the notices of appeal filed with this court name not only the Police Chiefs and Sheriffs, but also the cities, counties, and the East Texas Police Chiefs' Association. Of course, the doctrine of qualified immunity applies only to officials, and thus the portion of the summary judgment motion addressing Kinney's and Hall's claims against the cities, counties, and the East Texas Police Chiefs' Association attacked those claims solely on their merits. Because a district court's order denying summary judgment based on the merits of claims is not a final decision within the meaning of § 1291, we do not have jurisdiction over an appeal of such an order. Accordingly, we dismiss the appeal of the district court's summary judgment order brought by the cities, counties, and the East Texas Police Chiefs' Association.

15

review of the record, that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.") (internal quotations omitted).

Accordingly, the proper inquiry in the instant appeal is whether the district court was correct in determining that the facts alleged by Kinney and Hall were materially sufficient to establish that the Police Chiefs' and Sheriffs' conduct was objectively unreasonable in light of law that was clearly established at the time of the alleged violations. As the Court held in Mitchell, our inquiry is a purely legal one: assuming as true the facts alleged by the plaintiff that the district court determined to be in genuine dispute, we determine whether those facts "support a claim of violation of clearly established law." 472 U.S. at 528 n.9.[8]

## IV. QUALIFIED IMMUNITY

Under the doctrine of qualified immunity, "government officials performing discretionary functions[] generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow, 457 U.S. at 818. The Supreme Court pointed out

---

[8] The district court determined that there is a genuine factual dispute regarding whether the Police Chiefs and Sheriffs retaliated against Kinney and Hall for testifying against law enforcement officers by taking actions (such as complaining to Holda and agreeing to boycott Kinney's and Hall's classes) intended to force Kilgore College to remove Kinney and Hall from the ETPA faculty. See Kinney, 111 F. Supp. 2d at 834-35.

16

in Harlow that in most cases, the "of which a reasonable person would have known" language in the qualified-immunity standard does not add anything to the "clearly established law" requirement because "a reasonably competent public official should know the law governing his conduct." Id. at 818-19. However, the Court recognized that there may be "extraordinary circumstances" in which a government official "can prove that he neither knew nor should have known of the relevant legal standard" even though it was "clearly established." Id. at 819. Not long after Harlow, the Court refined the qualified-immunity standard by defining "clearly established" in a way that encompasses this "objective reasonableness" inquiry: To be "clearly established" for purposes of qualified immunity, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640 (1987). Thus, as this court has recognized, in light of the Anderson definition of "clearly established," the determination "whether a . . . right was clearly established at the time the defendant acted . . . requires an assessment of whether the official's conduct would have been objectively reasonable at the time of the incident." Conroe Creosoting Co. v. Montgomery County, 249 F.3d 337, 340 (5th Cir. 2001).

The Supreme Court also clarified in Anderson that its explication of the "clearly established" standard does not mean

17

"that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful." 483 U.S. at 640. Rather, conduct violates clearly established law if "in the light of pre-existing law the unlawfulness [is] apparent." Id. The Court further elaborated on the "clearly established" standard in Siegert v. Gilley, 500 U.S. 226 (1991), holding that the determination whether a right was clearly established at the time of the alleged violation necessarily entails a predicate "determination of whether the plaintiff has asserted a violation of a . . . right at all." Id. at 232.

## A. The § 1985(2) Claim

In the district court, Kinney and Hall claimed that, by retaliating against them for their expert testimony in the Kerrville case, the Police Chiefs and Sheriffs violated 42 U.S.C. § 1985(2). Under § 1985(2), it is unlawful to

> conspire to deter, by force, intimidation, or threat, any party or witness in any court of the United States from attending such court, or from testifying to any matter pending therein, freely, fully, and truthfully, or to injure such party or witness in his person or property on account of his having so attended or testified.

42 U.S.C. § 1985(2) (1994). Subsection (3) creates a cause of action to remedy harm caused by a violation of subsection (2):

> if one or more persons engaged [in such a conspiracy] do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property . . . the party so injured or deprived may have an action for the recovery of damages, occasioned by such injury or deprivation, against any one or more of the conspirators.

18

Id. § 1985(3).

The Police Chiefs and Sheriffs contend that Kinney's and Hall's § 1985(2) claims cannot withstand the "clearly established" test because it would not have been apparent to a reasonably competent official in October 1998 (when the East Texas Police Chiefs' Association held the meeting at which the Police Chiefs and Sheriffs agreed not to attend Kinney's and Hall's classes) that the Police Chiefs' and Sheriffs' conduct violated § 1985(2). The Police Chiefs and Sheriffs make three arguments in support of this position.

First, citing the Supreme Court's decision in Kush v. Rutledge, 460 U.S. 719 (1983), the Police Chiefs and Sheriffs note that for many years, the circuit courts of appeals interpreted the statute now codified as 42 U.S.C. § 1985(2) to prohibit only racially motivated retaliation. However, although the Kush Court did note that some circuits, including this circuit, had read a racial-animus requirement into § 1985(2), 460 U.S. at 723, the Court rejected that reading, holding that racial animus is not necessary to establish a § 1985(2) violation, id. at 726-27 ("[I]t is clear that Congress did not intend to impose a requirement of class-based animus on persons seeking to prove a violation of their rights under the first clause of § 1985(2)."). Thus, it is not necessary for Kinney and Hall to allege racial animus in order to assert a violation of § 1985(2). In addition, Kush — a decision issued in 1983 — leaves no doubt that it was

19

clearly established well before the alleged violations in the instant case occurred that § 1985(2)'s application is not limited to cases involving racial animus.

Second, the Police Chiefs and Sheriffs argue that it was not clearly established that Kinney and Hall had claims under § 1985(2) because it is not clear that the "witnesses" protected by this provision include expert witnesses. The Police Chiefs and Sheriffs note that the statute prohibits a conspiracy to injure a person because that person testified "truthfully" arguing that expert witnesses testify as to their opinions, which are neither true nor false. The district court, however, agreed with Kinney and Hall that the terms of the statute make clear that expert witnesses are protected. The court pointed out that § 1985(2) specifically refers to "any" witness, rejecting the argument that the reference to truthful testimony excludes expert witnesses. Kinney, 111 F. Supp. 2d at 837. In so concluding, the district court reasoned that "[e]xpert witnesses take the same oath that non-experts take," i.e., "they swear to tell the truth and nothing but the truth." Id.

We agree with the district court that the plain language of the statute does not permit a contrary reading. As the district court pointed out, the language of the statute is sweeping. On its face, § 1985(2) applies to "any party or witness." That the protected right is the right to testify "truthfully" cannot, as the Police Chiefs and Sheriffs suggest, reasonably be interpreted

20

as limiting the statute's protection to "fact" witnesses. Indeed, the premise underlying Kinney's and Hall's claims is that they have the right to testify freely as to what is in truth their opinion.

We also conclude that it would have been apparent to reasonably competent officials at the time of the alleged violations in this case that § 1985(2) proscribes conspiracies to intimidate or injure expert witnesses. In support of their argument that a reasonably competent official might have believed that § 1985(2) did not protect expert witnesses, the Police Chiefs and Sheriffs point out that neither the Supreme Court nor this court has specifically held that expert witnesses fall within the purview of § 1985(2). The Police Chiefs and Sheriffs incorrectly assume that a legal rule can be clearly established only pursuant to judicial decisions. The doctrine of qualified immunity assumes that reasonably competent officials know clearly established constitutional or statutory rights. Certainly, there may be circumstances in which a judicial opinion is necessary to clarify sufficiently that particular conduct violates the statutory provision invoked by the plaintiff. Such judicial clarification is not necessary, however, in interpreting § 1985(2). Subsection 1985(2) was in effect in October 1998, clearly deeming it unlawful to "conspire to deter, by force, intimidation, or threat, any . . . witness." Thus, we conclude that it would have been objectively unreasonable for the Police

21

Chiefs and Sheriffs to believe that retaliation against Kinney and Hall for their testimony in the Kerrville case was lawful under § 1985(2) simply because Kinney and Hall testified as expert witnesses.

Finally, the Police Chiefs and Sheriffs argue that it was not clearly established in October 1998 that the conduct in question would injure Kinney and Hall in their "person[s] or property," as required by § 1985(2) and (3). Pointing out that they were not contractually obligated to send their officers to the ETPA or to any particular instructor for training, the Police Chiefs and Sheriffs argue that it was not clearly established that Kinney and Hall had a property interest in the Police Chiefs' and Sheriffs' enrollment of their officers in Kinney's and Hall's courses. The Police Chiefs and Sheriffs further contend that Kinney's and Hall's employment at Kilgore College was at-will, which does not establish a property right under Texas law and thus is not a property interest for purposes of the Due Process Clause. Consequently, the Police Chiefs and Sheriffs argue, it would have been reasonable for an officer to believe that at-will employment was not "property" for purposes of § 1985(2).

In response to this argument, Kinney and Hall do not take the position that they were not at-will employees, but rather rely on Haddle v. Garrison, 525 U.S. 121 (1998), in which the Supreme Court held that "third-party interference with at-will

22

employment relationships[] states a claim for relief under § 1985(2)."  Id. at 126.  In Haddle, the Court reasoned that because "[t]he gist of the wrong at which § 1985(2) is directed is not deprivation of property, but intimidation or retaliation against witnesses in federal-court proceedings," "we see no reason to ignore th[e] tradition" in tort law of compensating for "[t]he kind of interference with at-will employment relations alleged here."  Id. at 125-26.  The Police Chiefs and Sheriffs, however, dismiss Haddle as irrelevant to this case because it was issued on December 14, 1998, after the events of October 1998.

Although a decision such as Haddle, which holds that the very conduct in question constitutes a violation of the right invoked by the plaintiff, is not necessary to establish that a reasonably competent official would have understood that the conduct was unlawful, Anderson, 483 U.S. at 640, we agree with the Police Chiefs and Sheriffs that it was not clearly established as of October 1998 that the "property" contemplated by § 1985(2) included at-will employment.  As the Police Chiefs and Sheriffs point out, the Court granted certiorari in Haddle to resolve a circuit conflict on the question whether at-will employment is "property" within the meaning of § 1985(2).  525 U.S. at 124.  Further, as of the Court's Haddle decision, this circuit had not come down on one side or the other of the § 1985(2) "property" issue.  Thus, given the absence of a definitive judicial interpretation of "property" for purposes of

23

§ 1985(2), coupled with the fact that at-will employment is not "property" for purposes of the Due Process Clause, we cannot conclude that § 1985(2) by its terms clearly established that third-party interference with at-will employment was injury to property.

However, the alleged conduct that forms the basis of Kinney's and Hall's § 1985(2) claims did not all take place in or before October 1998. Subsection 1985(3) creates a cause of action for injury to person or property caused by "any act in furtherance of the object of [a] conspiracy [to injure a witness in retaliation for his or her testimony]." § 1985(3) (emphasis added). Kinney and Hall have alleged that the Police Chiefs and Sheriffs took actions in furtherance of their conspiracy to have Kinney and Hall removed from their ETPA positions after as well as before the Supreme Court issued its decision in Haddle on December 14, 1998. In particular, Kinney and Hall claim (and the Police Chiefs and Sheriffs conceded in their depositions) that the Police Chiefs and Sheriffs continued to prohibit their officers from enrolling in Kinney's or Hall's classes for the entire time that they were working as instructors at the ETPA. Hall's resignation from the ETPA became effective on January 3, 1999, and Kinney's ETPA contract expired on September 1, 1999. Viewing the summary judgment record in the light most favorable to Kinney and Hall, it is reasonable to infer that if the Police Chiefs and Sheriffs had ceased their boycott of Kinney's and

24

Hall's courses after Haddle was issued, Holda may have reconsidered his conclusion that it was no longer economically viable for Kilgore College to offer Kinney's and Hall's courses, and thus Kinney and Hall may not have been injured.

Apparently conceding that Haddle was part of the clearly established law while the Police Chiefs and Sheriffs continued their boycott of Kinney's and Hall's courses, the dissent maintains that, under current law, the Police Chiefs' and Sheriffs' alleged conduct does not violate § 1985(2) because "when Congress enacted [§ 1985(2)] in 1871, it could not have intended it to extend to the facts at hand."  It is not necessary, however, for the Congress of 1871 to have specifically contemplated the facts of the instant case in order to justify a conclusion that those facts constitute a violation of § 1985(2). Moreover, the dissent's unsupported assertions about congressional intent are belied by portions of § 1985(2)'s legislative history indicating that the Congress of 1871 intended for this provision's language regarding the rights of parties and witnesses in federal court to have "enormous sweep."  Kush, 460 U.S. at 726 (internal quotations and citations omitted).[9]  This

_____

[9]  The dissent correctly points out that the Kush Court characterized Congress's addition of "equal protection" language to the second part of § 1985(2) as an attempt to limit the "enormous sweep of the original language" in that part.  However, this characterization does not affect our analysis of the first part of § 1985(2) invoked by Kinney and Hall in the instant case. Indeed, the Kush Court discussed the legislative history of § 1985 in the context of distinguishing the provisions of § 1985 that Congress limited — namely, the provisions governing

25

aspect of § 1985(2)'s legislative history supports the Haddle Court's conclusion that "[t]he gist of the wrong at which § 1985(2) is directed is . . . intimidation or retaliation against witnesses in federal-court proceedings," and not specific types of injury to person or property. 525 U.S. at 125.

The dissent also maintains that Haddle does not make it "apparent . . . that not enrolling the officers to receive training from Plaintiffs constitutes [an] injury [to property within the meaning of § 1985(2)]." Haddle's applicability to the instant case is apparent, however, when the facts at hand are properly viewed in the light most favorable to Kinney and Hall. The conduct that we assume is attributable to the Police Chiefs and Sheriffs for purposes of summary judgment — i.e., boycotting Kinney's and Hall's classes in order to pressure Holda to remove them from the ETPA faculty — clearly constitutes interference with Kinney's and Hall's employment and thus "injury in their property" under § 1985(2) as construed by the Haddle Court.

Thus, we conclude that after Haddle, the contours of § 1985(2) were sufficiently clear that it would have been

---

"activity that is not institutionally linked to federal interests and that is usually of primary state concern" (such as obstruction of justice in state courts) — from those provisions of § 1985 that Congress did not limit — namely, the provisions governing activity that is institutionally linked to federal interests. Kush, 460 U.S. at 725-26. These "federal institutional" provisions of § 1985 — including the provision protecting witnesses and parties in federal court that Kinney and Hall invoke — still contain the original, sweeping language. See id.

26

apparent to a reasonably competent official that the ongoing boycott of Kinney's and Hall's courses violated § 1985(2).  The district court properly denied the Police Chiefs and Sheriffs qualified immunity from the § 1985(2) claim.[10]

## B.  *The § 1983 Claim Invoking the Right to Freedom of Speech Under the First and Fourteenth Amendments*

The district court also denied the Police Chiefs and Sheriffs qualified immunity against Kinney's and Hall's § 1983 claims alleging that the Police Chiefs and Sheriffs unlawfully retaliated against Kinney and Hall for exercising their rights to free speech under the First and Fourteenth Amendments.[11]  The court evaluated the summary judgment evidence in light of the law

---

[10]  The Police Chiefs and Sheriffs also argue that "all reasonable officers in October 1998 would [not] have known that Defendants' actions —— furthering public safety through high-quality training for their officers, expressing concerns over instructors' conflicts of interests, exercising discretion to choose instructors for training their law enforcement officers, maintaining confidentiality over their internal methods of law enforcement, and preventing someone privy to sensitive and confidential information from [testifying] as an expert witness in future litigation against them —— would violate [§ 1985(2)]." However, the Police Chiefs and Sheriffs are merely asserting their version of the facts that the district court determined to be in genuine dispute.  Such assertions are appropriately made to the jury, not to this court on interlocutory appeal.  We conclude that the Police Chiefs and Sheriffs are not entitled to qualified immunity from Kinney's and Hall's § 1985(2) claims because, assuming Kinney and Hall's version of the facts to be true, "those facts are materially sufficient to establish that [the Police Chiefs and Sheriffs] acted in an objectively unreasonable manner [in light of clearly established law]."  Chiu, 260 F.3d at 341 (citation and internal quotations omitted).

[11]  "It has long been established that the[] First Amendment freedoms are protected by the Fourteenth Amendment from invasion by the States."  Edwards v. South Carolina, 372 U.S. 229, 235 (1963).

27

governing First Amendment retaliation claims brought by public employees.  See Kinney, 111 F. Supp. 2d at 837.  Acknowledging that Kinney and Hall were not employees of the Police Chiefs and Sheriffs, the district court noted that in Board of County Commissioners v. Umbehr, 518 U.S. 668 (1996), the Supreme Court held that the First Amendment analysis applied in the public employment context is also applicable to the First Amendment claims of independent contractors who provide services to the government.  The court concluded that Kinney and Hall "are the equivalent of a governmental independent contractor" because "they were hired by the defendants to train their officers." Kinney, 111 F. Supp. 2d at 841 (citing Umbehr, 518 U.S. at 674).

The district court determined that there was sufficient evidence to raise a genuine factual issue on each of the three elements of a First Amendment retaliation claim in the public employment context.  First, the district court found that both Kinney and Hall claimed that they had suffered adverse employment actions by being forced to accept lower paying jobs as a result of the Police Chiefs' and Sheriffs' boycott.  Id. at 838. Second, the court held that Kinney's and Hall's testimony regarding the use of excessive force by police officers is unquestionably a matter of public concern.  Id.  Finally, the court determined that the balancing inquiry set forth in Pickering v. Board of Education, 391 U.S. 563, 568 (1968), weighed in favor of Kinney and Hall, i.e., that Kinney's and

Hall's "interest in commenting on matters of public concern outweighs the defendants' interest in promoting efficiency." Kinney, 111 F. Supp. 2d at 838. The court further determined that the law under which it examined the summary judgment evidence was clearly established at the time of the alleged violation and that the Police Chiefs' and Sheriffs' conduct was objectively unreasonable in light of that clearly established law. See id. at 840-44.

As we noted in our analysis of Kinney's and Hall's § 1985 claims, the threshold issue in a qualified-immunity inquiry is whether, "[t]aken in the light most favorable to the party asserting the injury, . . . the facts alleged show the officer's conduct violated a constitutional right." Saucier v. Katz, 121 S. Ct. 2151, 2156 (2001). Only if we determine that the facts establish a constitutional violation do we address the "more particularized" question whether "[t]he contours of the right [were] sufficiently clear [at the time of the alleged violation] that a reasonable official would understand that what he is doing violates that right." Anderson, 483 U.S. at 640. For purposes of both these inquiries, we assume as true the facts alleged by Kinney and Hall, namely, that the Police Chiefs and Sheriffs retaliated against Kinney and Hall for their testimony against a law enforcement officer by "blackballing" them in the law enforcement community of East Texas with the intention of forcing Kilgore College to remove them from the ETPA faculty. See

29

Kinney, 111 F. Supp. 2d at 838 ("[T]he record demonstrates that the plaintiffs' speech motivated the decision to boycott their business.") Accordingly, we first address whether such conduct constitutes a violation of Kinney's and Hall's rights to free speech.

   1.   *Was there a First Amendment violation?*

"Throughout its history th[e Supreme] Court has consistently recognized at least two ways in which constitutionally protected freedom of speech is narrower than an unlimited license to talk": (1) "certain forms of speech, or speech in certain contexts, has been considered outside the scope of constitutional protection," and (2) some governmental limitations of protected speech have nevertheless been determined to be valid under the First Amendment. Konigsberg v. State Bar of Cal., 366 U.S. 36, 49-51 (1961). Accordingly, we first address whether Kinney's and Hall's testimony falls under the First Amendment's protection, and if we determine that the testimony is protected speech, we then determine what the applicable First Amendment standard is and whether the Police Chiefs' and Sheriffs' restriction of Kinney's and Hall's speech violated the First Amendment.

      a.   *Is the speech protected by the First Amendment?*

There is no question that Kinney's and Hall's testimony in the Kerrville case is speech protected by the First Amendment. Testimony in judicial proceedings "is inherently of public concern." Johnston v. Harris County Flood Control Dist., 869

30

F.2d 1565, 1578 (5th Cir. 1989); see also Reeves v. Claiborne County Bd. of Educ., 828 F.2d 1096, 1100 (5th Cir. 1987) (testimony in civil proceedings); Smith v. Hightower, 693 F.2d 359, 368 (5th Cir. 1982) (testimony in criminal proceedings); Rainey v. Jackson State Coll., 481 F.2d 347, 349-50 (5th Cir. 1973) (testimony of expert witness). Moreover, the testimony at issue in the instant case is of public concern not only because of its context, but also because of its subject matter — i.e., the use of excessive force by police officers. We have repeatedly emphasized that "[e]xposure of official misconduct, especially within the police department, is generally of great consequence to the public." Branton v. City of Dallas, 272 F.3d 730, 740 (5th Cir. 2001) (citing Brawner v. City of Richardson, 855 F.2d 187, 191-92 (5th Cir. 1988)); see also Davis v. Ector County, 40 F.3d 777, 782 (5th Cir. 1994) ("There is perhaps no subset of 'matters of public concern' more important than bringing official misconduct to light."). As speech of public concern, Kinney's and Hall's testimony is "at the heart of the First Amendment's protection." First Nat'l Bank v. Bellotti, 435 U.S. 765, 776 (1978).

      *b.   What is the applicable First Amendment analysis?*

Having concluded that Kinney's and Hall's testimony is protected speech, we must next determine the appropriate First Amendment analysis for evaluating the Police Chiefs' and Sheriffs' conduct. The First Amendment shields speech "not only

31

[from] direct limitations . . . but also [from] adverse government action against individual[s] because of [their speech]," including the denial of public benefits to punish individuals for their speech. Colson v. Grohman, 174 F.3d 498, 508 (5th Cir. 1999). In the instant case, the district court found such a denial of public benefits because the Police Chiefs and Sheriffs retaliated against Kinney and Hall for their testimony against law enforcement officers by boycotting Kinney's and Hall's courses with the intention of compelling Kilgore College to remove them from the ETPA faculty.

The Police Chiefs and Sheriffs suggest that their relationship with Kinney and Hall was too attenuated to create any power on the part of the Police Chiefs and Sheriffs to grant or deny Kinney and Hall any benefits. Specifically, the Police Chiefs and Sheriffs argue that their conduct did not deny Kinney and Hall the "benefit" of employment because Kilgore College, and not the Police Chiefs and Sheriffs, had authority to refuse to renew Kinney's and Hall's contracts. We disagree: the Supreme Court has made clear that First Amendment protection does not depend on whether the governmental action at issue is "direct" or "indirect." See Perry v. Sindermann, 408 U.S. 593, 597-98 (1972) (holding that the plaintiff teacher's "lack of a contractual or tenure 'right' to re-employment for [another] academic year is immaterial to his free speech claim"). To hold that the Police Chiefs' and Sheriffs' conduct cannot constitute a First Amendment

violation because they did not directly deny Kinney and Hall the benefit of employment, but instead used governmental power to exert economic pressure on Kinney and Hall's employer in order to achieve that same result, "would allow the government to 'produce a result which [it] could not command directly.'" Id. at 597 (quoting Speiser v. Randall, 357 U.S. 513, 526 (1958)) (alteration in original).[12]  "Such interference with constitutional rights is impermissible."  Id.

The Police Chiefs and Sheriffs also contend that their conduct does not amount to a denial of benefits actionable under the First Amendment because their decisions on whether and where to enroll officers are discretionary — they had no legal

_____

[12]  The dissent expresses skepticism regarding whether "enrollment of students in a particular class with a particular teacher [can constitute] a cognizable benefit, the withholding of which would be protected by our First Amendment jurisprudence." However, when the principle enunciated by the Perry Court is applied to the facts of the instant case (viewed in the light most favorable to Kinney and Hall), it is evident that the Police Chiefs and Sheriffs denied Kinney and Hall a benefit: the Police Chiefs and Sheriffs withdrew their officers from and ceased enrolling officers in any course taught by Kinney or Hall in order to pressure Kilgore College to remove them from the ETPA faculty.  Further, it is important to bear in mind that the First Amendment does not protect receipt of governmental benefits per se, as the dissent's argument appears to suggest, but rather protects the speech that the government seeks to inhibit through the denial of a benefit.  Cf. Bd. of County Comm'rs v. Umbehr, 518 U.S. 668, 675 (1996) ("[T]he First Amendment does not create property or tenure rights . . . .  The First Amendment's guarantee of freedom of speech protects government employees from termination because of their speech on matters of public concern.").  As the Court explained in Perry, "if the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited."  408 U.S. at 597.

33

obligation to enroll their officers in Kinney's and Hall's courses. However, whether an individual is entitled to the benefit denied is irrelevant to our First Amendment analysis. Governmental discretion is <u>always</u> bound by the Constitution. As the Court stated in <u>Perry</u>:

> For at least a quarter-century, this Court has made clear that even though a person has no "right" to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely. It may not deny a benefit to a person on a basis that infringes his constitutionally protected interests —— <u>especially, his interest in freedom of speech</u>.

<u>Id.</u> at 597 (emphasis added).

This general principle enunciated in <u>Perry</u>, known as the "'unconstitutional conditions' doctrine," <u>Umbehr</u>, 518 U.S. at 674, has been applied in a variety of contexts. The appropriate analytical framework for applying the "unconstitutional conditions" doctrine to a given First Amendment claim depends on the context in which the claim arose. As the Court explained in <u>Umbehr</u>, "unconstitutional conditions" cases form a "spectrum": at one end lie cases involving "government employees, whose close relationship with the government requires a balancing of important free speech and government interests," and on the other end lie cases involving "ordinary citizens whose viewpoints on matters of public concern the government has no legitimate interest in repressing." 518 U.S. at 680.[13]

---

[13] The <u>Umbehr</u> Court noted that in between these two ends of the "unconstitutional conditions" spectrum lie "claimants for tax

34

The Court has determined that interest-balancing is appropriate in "governmental employee" cases, but not in "ordinary citizen" cases, because "[t]he government's interest in achieving its goals as effectively and efficiently as possible is elevated from a relatively subordinate interest when it acts as sovereign to a significant one when it acts as employer." Waters v. Churchill, 511 U.S. 661, 675 (1994) (plurality opinion). Because the government has no legitimate interest in denying a benefit to "ordinary citizens" because of their speech on matters of public concern, there is no interest-balancing involved in the First Amendment analysis for "ordinary citizen" cases. Umbehr, 518 U.S. at 675-76; Blackburn v. City of Marshall, 42 F.3d 925, 932, 934 (5th Cir. 1995). Rather, the First Amendment is violated in "ordinary citizen" cases if (1) the individual engaged in conduct protected by the First Amendment and (2) the government took adverse action against the person because of that protected conduct. See, e.g., Rolf v. City of San Antonio, 77 F.3d 823, 827 (5th Cir. 1996); N. Miss. Communications, Inc. v. Jones, 792 F.2d 1330, 1337 (5th Cir. 1986); Sisk v. Tex. Parks & Wildlife Dep't, 644 F.2d 1056, 1059 (5th Cir. Unit A May 1981); Fitzgerald v. Peek, 636 F.2d 943, 945 (5th Cir. Jan. 1981).

---

exemptions," 518 U.S. at 680, (citing Speiser v. Randall, 357 U.S. 513 (1958)), "users of public facilities," id. (citing Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist., 508 U.S. 384, 390-94 (1993)), "and recipients of small government subsidies," id. (citing FCC v. League of Women Voters, 468 U.S. 364 (1984)).

The Supreme Court recognized the need for interest-balancing in the public employment context and "indicate[d] some of the general lines along which an analysis of the controlling interests should run" in Pickering v. Board of Education, 391 U.S. 563, 569 (1968). In that case, the Court held that a board of education violated a teacher's First Amendment rights by discharging him in retaliation for his criticism of the board's school funding decisions. See id. at 566, 574-75. In so holding, the Court emphasized that government employees "may [not] constitutionally be compelled to relinquish the First Amendment rights they would otherwise enjoy as citizens to comment on matters of public interest in connection with the operation of the public [institutions] in which they work." Id. at 568. The Court also recognized, however, that "the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." Id. Thus, explained the Court, it is necessary "to arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." Id.

In Umbehr and its companion case, O'Hare Truck Service, Inc. v. City of Northlake, 518 U.S. 712 (1996), the Court held that

36

the "governmental employee" version of the unconstitutional-conditions doctrine —— i.e., a Pickering balancing inquiry —— is also appropriate where an independent contractor alleges a First Amendment violation against the government.  See O'Hare Truck Serv., 518 U.S. at 719-21; Umbehr, 518 U.S. at 677-78, 684-85.  The Court reasoned that the government's "[i]ndependent contractors are similar in most relevant respects to government employees."  Umbehr, 518 U.S. at 684.  Specifically, the Court noted:

> The government needs to be free to terminate both employees and contractors for poor performance, to improve the efficiency, efficacy, and responsiveness of service to the public, and to prevent the appearance of corruption.  And, absent contractual, statutory, or constitutional restriction, the government is entitled to terminate them for no reason at all.  But either type of relationship provides a valuable financial benefit, the threat of the loss of which in retaliation for speech may chill speech on matters of public concern by those who, because of their dealings with the government, "are often in the best position to know what ails the agencies for which they work."

Id. at 674 (quoting Waters, 511 U.S. at 674).

Based on reasoning similar to that of the Court in Umbehr and O'Hare Truck Service, this court has also applied a Pickering balancing test in First Amendment retaliation cases arising outside the public employment context.  See, e.g., Copsey v. Swearingen, 36 F.3d 1336, 1344 (5th Cir. 1994) (holding that a Pickering balancing analysis was the appropriate framework for evaluating a vending stand operator's First Amendment claim based on a state agency's revocation of his license after he publicly

37

criticized the licensing program) ("Copsey is not a public

employee.  Nevertheless, the Rules and Regulations of the

[agency's vendor licensing program] bear the mark of an

employment-type relationship."); Caine v. Hardy, 943 F.2d 1406,

1415-16 (5th Cir. 1991) (en banc) (treating an anesthesiologist

with clinical privileges at a public hospital as a "public

employee" for purposes of his First Amendment claim based on the

hospital's permanent suspension of his clinical privileges after

he opposed a proposal made by the chief of anesthesiology).  On

the other hand, in some circumstances individuals who have a

relationship with the government beyond that of an "ordinary

citizen" are nonetheless more appropriately placed at the

"ordinary citizen" end of the Umbehr spectrum than at the

"governmental employee" end.  In such cases, the "ordinary

citizen" version of the "unconstitutional conditions" doctrine is

applicable.  See Blackburn, 42 F.3d at 932, 934-35.

As we explained in Blackburn, the determination whether a

relationship between the government and an individual falls on

the "governmental employee" end of the Umbehr spectrum turns on

whether the relationship is sufficiently "analogous to an

employment relationship."[14]  42 F.3d at 932.  Applying this

_____

[14]  We determined in Blackburn that there is another
situation in which balancing is appropriate; namely, if the
speech at issue does not involve matters of public concern, but
instead involves matters only of personal interest.  Blackburn,
42 F.3d at 933 (citing Connick v. Meyers, 461 U.S. 138, 146-47,
154 (1983)). As we have already concluded, Kinney's and Hall's
testimony is speech of public concern, and thus the Connick prong

38

standard in <u>Blackburn</u>, we held that the <u>Pickering</u> balancing test was not applicable to a wrecker service owner's First Amendment retaliation claim against police officials for revoking his permission to use the police radio frequency.  <u>Id.</u> at 930, 934.[15] We reasoned that the business relationship between the wrecker service owner and the police officers was similar to that between the governmental defendant and the plaintiff in <u>North Mississippi Communications</u>, another case in which we applied the "ordinary citizen" version of the "unconstitutional conditions" doctrine. <u>See</u> <u>Blackburn</u>, 42 F.3d at 934.  <u>North Mississippi Communications</u> involved a newspaper's First Amendment claim alleging that a county board had ceased placing legal notices in the newspaper in retaliation for the publication of editorials that criticized the board and its members.  792 F.2d at 1337.  We did not apply a <u>Pickering</u> balancing test to the newspaper's First Amendment claim, but rather held that "[a]lthough the [newspaper] may have no 'right' to receive certain legal advertising from the County Board . . . it would violate the Constitution for the Board to withhold public patronage, in the form of its advertising, . . . in retaliation for that newspaper's exercise of first amendment rights."  <u>Id.</u>

---

of the <u>Blackburn</u> analysis does not apply in this case.

[15]  Revocation of the wrecker service owner's permission to use the police radio frequency rendered him unable to participate in a rotation system for removing vehicles from the scenes of accidents.  <u>Blackburn</u>, 42 F.3d at 930.

In arguing that Kinney and Hall were not denied any "benefits," the Police Chiefs and Sheriffs emphasized their lack of employment-type ties to Kinney and Hall.  In contrast, in support of their argument regarding the appropriate First Amendment analysis, the Police Chiefs and Sheriffs characterize their relationship with the ETPA and ETPA instructors as sufficiently akin to employment to warrant a balancing of the Police Chiefs' and Sheriffs' interests against the free speech interests at stake in this case.[16]  In support of this claim, the Police Chiefs and Sheriffs note that the East Texas Police Chiefs' Association founded the ETPA in 1966 and operated it until it later became a part of Kilgore College.  In addition, the Police Chiefs and Sheriffs point out, they had sent officers to the ETPA for training for over three decades prior to the Kerrville case controversy, and many law enforcement officials

---

[16]  Similarly, although the dissent points out that Kilgore College "had the sole authority to hire and fire" Kinney and Hall in arguing that the Police Chiefs' and Sheriffs' enrollment decisions cannot amount to a "denial of benefits" for First Amendment purposes, the dissent nevertheless agrees with our determination that the governmental interests at stake in the instant case are sufficiently analogous to employment interests to warrant application of a Pickering balancing analysis instead of an "ordinary citizen" analysis.  As the Umbehr Court recognized, the ability to suppress constitutionally-protected speech through the denial of a benefit tends to go hand-in-hand with employer-like interests.  See 518 U.S. at 674 (noting that the government "provides a valuable financial benefit [to governmental contractors as well as employees], the threat of the loss of which in retaliation for speech may chill speech on matters of public concern").

40

from the East Texas region (including the Police Chiefs and Sheriffs) sat on the ETPA's advisory board.

Relying on North Mississippi Communications and Worrell v. Henry, 219 F.3d 1197 (10th Cir. 2000), Kinney and Hall respond that the "ordinary citizen" version of the unconstitutional-conditions doctrine is better suited to the circumstances of the instant case than is the "governmental employee" test requiring interest-balancing. In Worrell, the Tenth Circuit declined to apply a Pickering balancing test to a First Amendment claim alleging that the governmental defendant pressured the plaintiff's employer to rescind the plaintiff's job offer in retaliation for the plaintiff's testimony in a criminal case. See 219 F.3d at 1202, 1209-12. Rather, the Worrell court determined that the appropriate First Amendment analysis for evaluating the plaintiff's claim was the "ordinary citizen" version of the unconstitutional-conditions doctrine. See id. at 1212-13.[17]

We agree with the district court and the Police Chiefs and Sheriffs that a Pickering balancing analysis is properly applied to Kinney's and Hall's First Amendment claims. The relationship between the Police Chiefs and Sheriffs and ETPA instructors such

---

[17] We note that the Police Chiefs and Sheriffs are incorrect in their claim that the Tenth Circuit established a "new" First Amendment analysis in Worrell. The Worrell court simply applied the "ordinary citizen" version of the "unconstitutional conditions" doctrine that federal courts have been applying for years in cases that do not arise in the public employment context.

as Kinney and Hall involves governmental interests similar to those involved in the public employment context. Legitimate interests require that law enforcement agencies be afforded considerable discretion in choosing the instructors who train the officers who will, in turn, carry out the agencies' public duties on a daily basis. Those interests include, for example, ensuring that the instructors are competent and knowledgeable, that they are adept at conveying that knowledge to officer-students, and that they maintain a good working relationship with law enforcement agency officials so that those officials can monitor the training that their officers receive. These interests are all relevant to the ultimate governmental interest that the Pickering balancing analysis is meant to protect, i.e., the interest "in promoting the efficiency of the public services [a law enforcement agency] performs." Pickering, 391 U.S. at 568.

Although Kinney and Hall are correct that many of the facts of Worrell are similar to those at issue in this case, there is a significant difference between the relationship that the Worrell governmental defendant had with the plaintiff and the relationship that the Police Chiefs and Sheriffs had with Kinney and Hall. It is this relationship that determines whether application of the "ordinary citizen" or the "governmental employee" version of the "unconstitutional conditions" doctrine is appropriate. In contrast to this case, the relationship between the plaintiff and the non-employer governmental defendant

42

in Worrell was not analogous to an employment relationship.  The

Worrell defendant, an official in charge of a state drug

enforcement agency, had offered to assist those working in the

district attorney's "drug task force."  219 F.3d at 1202.

However, upon learning that the district attorney offered the

plaintiff the position of task force coordinator, the defendant

informed the district attorney that the state drug agency would

not assist the drug task force unless the plaintiff's job offer

was rescinded because the plaintiff had testified as an expert

witness for the defense in a prosecution for the murder of one of

the agency's officers.  See id.  Thus, unlike the relationship

that the Police Chiefs and Sheriffs had with Kinney and Hall, the

relationship between the Worrell defendant and plaintiff was not

analogous to an employment relationship.  The Worrell defendant

did not pay the task force members for their services to help the

drug agency carry out its mission (which might have created an

employment-type relationship), but rather offered to assist the

task force members in carrying out the task force's mission.  In

contrast, the Police Chiefs and Sheriffs in effect retained

Kinney and Hall to train officers, a core aspect of the public

services performed by the Police Chiefs' and Sheriffs' respective

law enforcement agencies.

Thus, we conclude that the district court correctly

determined that Kinney's and Hall's First Amendment claims are

subject to a Pickering balancing test.  In cases where the

43

relationship between the governmental defendant and the plaintiff necessitates balancing of interests, the elements of a First Amendment retaliation claim properly reviewed on interlocutory appeal are the legal questions (1) whether the speech "can be fairly characterized as constituting speech on a matter of public concern," and (2) whether the Pickering balance weighs in favor of the First Amendment interests at stake in the case. Branton, 272 F.3d at 739 (internal quotations omitted). "It is for the jury to resolve any remaining factual disputes as to [causation]." Id. We have already concluded that Kinney's and Hall's testimony is clearly on a matter of public concern. Accordingly, we now consider whether the district court correctly balanced the interest in protecting that speech against the Police Chiefs' and Sheriffs' interests in suppressing it.

> c. *Does the conduct in question violate the First Amendment under the applicable First Amendment analysis?*

The Pickering balancing test requires a case-specific inquiry. See O'Hare Truck Serv., 518 U.S. at 719-20; see also Pickering, 391 U.S. at 569 ("Because of the enormous variety of fact situations [involving] critical statements by . . . public employees . . ., we do not deem it either appropriate or feasible to attempt to lay down a general standard against which all such statements may be judged."). Accordingly, we must determine whether the First Amendment interest in ensuring that individuals working in law enforcement are able to speak freely about police

misconduct outweighs the Police Chiefs' and Sheriffs' interests in prohibiting their training instructors from testifying in an excessive-force case in another part of the state against a police officer who had never taken courses at the ETPA and a police department that had never enrolled officers in ETPA courses. In contrast, the dissent asks whether the First Amendment interests outweigh the Police Chiefs' and Sheriffs' more general "interests in effective training of their law enforcement personnel." We do not consider it appropriate to frame the governmental interest involved in the instant case in such broad terms. As noted above, while we recognize that this interest in effective training of law enforcement officers requires that law enforcement agencies be afforded considerable discretion in choosing officer-training instructors, this discretion is bounded by the Constitution. In this case, the question is whether the Police Chiefs and Sheriffs exceeded the limits imposed by the First and Fourteenth Amendments. To answer that question, <u>Pickering</u> instructs that we assess the government's interest in restricting the <u>particular speech</u> in question.

The <u>Pickering</u> Court considered a school board's interest in restricting a teacher's statements criticizing the board's distribution of school funds — not the school board's more general interest in choosing teachers — against the First Amendment interest in protecting those statements. See 391 U.S.

45

at 569-73.  Similarly, the appropriate inquiry in the instant case is whether the Police Chiefs' and Sheriffs' interests in prohibiting their training instructors from testifying as experts in an excessive-force trial held in another part of the state against a police officer who had never taken courses at the ETPA and a police department that had never enrolled officers in ETPA courses outweighs the First Amendment interest in protecting such speech.  To consider, as the dissent does, only the Police Chiefs' and Sheriffs' general interests in choosing instructors, divorced from the particular circumstances in which they exercised this power with respect to Kinney and Hall, renders the Pickering balancing analysis virtually powerless to protect First Amendment interests.  Having defined the proper Pickering inquiry, we now turn to the First Amendment interest at stake in this case.

The First Amendment interest at stake in this case is extremely strong.  Protection of speech critical of public officials' exercise of their powers is an integral part of the "public debate" that the First Amendment protects.  As the Court recognized in New York Times Co. v. Sullivan, 376 U.S. 254 (1964), there is "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials."  Id. at 270.  As noted above, this court has also

46

recognized the great First Amendment significance of speech regarding misconduct of public officials, "especially when it concerns the operation of a police department." Brawner, 855 F.2d at 191-92.[18] Indeed, because individuals working in law enforcement "are often in the best position to know" about the occurrence of official misconduct, Umbehr, 518 U.S. at 674, "it is essential" that individuals such as Kinney and Hall "be able to speak out freely" about officer misconduct, particularly misconduct that is as serious as excessive force, Pickering, 391 U.S. at 572. As the district court pointed out, "[i]ndividuals will have a hard time succeeding in an excessive force case without the assistance of experts who are intimately acquainted with police procedures." Kinney, 111 F. Supp. 2d at 838.

---

[18]  Although the dissent acknowledges that Kinney's and Hall's "testi[mony] as expert witnesses against law enforcement" is protected speech under the First Amendment, the dissent's Pickering balancing analysis fails to take into account the great strength of the First Amendment interest in protecting speech about official misconduct. Notably, in weighing the governmental interest against the First Amendment interest involved in this case, the dissent does not mention that the subject matter of Kinney's and Hall's speech was official misconduct, much less official misconduct as grave as a police officer's use of excessive force. The dissent further minimizes the First Amendment interest at stake in this case by characterizing it as solely Kinney's and Hall's interest. However, it is well-established that the First Amendment interest in protecting speech on matters of public concern — particularly speech regarding official misconduct — is preeminently a public interest. See, e.g., Stromberg v. California, 283 U.S. 359, 369 (1931) ("The maintenance of the opportunity for free political discussion to the end that government may be responsive to the will of the people and that changes may be obtained by lawful means, an opportunity essential to the security of the Republic, is a fundamental principle of our constitutional system.").

In the particular circumstances of this case, we find it clear that this significant First Amendment interest outweighs any interest of the Police Chiefs and Sheriffs in prohibiting their training instructors from testifying against law enforcement.  The Police Chiefs and Sheriffs claim that Kinney's and Hall's testimony created a "conflict of interest" and "violated . . . principles of cooperative responsibility [and] trust," thereby "undermin[ing] [the Police Chiefs' and Sheriffs'] feelings of personal loyalty and confidence" in Kinney and Hall and potentially damaging the relationship between student-officers and training instructors.  Although there may be cases in which it is conceivable that speech by a training instructor could threaten these interests, we find any such threat inconceivable in the instant case.  As the district court pointed out, Kinney and Hall "testified against a police department located in an entirely different part of the state than the one in which they trained officers."  Kinney, 111 F. Supp. 2d at 843.  In invoking notions of "conflict of interest," "personal loyalty," and "principles of cooperative responsibility" under the circumstances that obtained here, the Police Chiefs and Sheriffs appear to be employing euphemisms for a "code of silence" prohibiting persons who work in law enforcement from speaking out about misconduct on the part of others working in law enforcement.  See Snyder v. Trepagnier, 142 F.3d 791, 797 n.6 (5th Cir. 1998) (quoting the testimony of an expert in the field

of police operations and administration describing "the existence

of a very deeply-rooted code of silence . . . a code within the

police department that, regardless what the behavior, one police

officer does not report or testify against another police

officer").[19]  Enforcing such a "code of silence" is not a

legitimate interest because it does not promote the efficiency of

---

[19]  This case is by no means the first time that this court
has recognized the existence of a "code of silence" among law
enforcement officers.  See, e.g., Piotrowski v. City of Houston,
237 F.3d 567, 575 & n.8, 576-77 (5th Cir. 2001) (concluding that
the deposition of a police officer established that, pursuant to
the Houston Police Department's "code of silence," police
officers "took affirmative steps to suppress any information
concerning [possible mistakes in an] investigation"); Sharp v.
City of Houston, 164 F.3d 923, 936 (5th Cir. 1999) (concluding
that the "evidence supports the conclusion that [the Houston
Police Department] at least tacitly authorized, and maybe
encouraged and assisted in, retaliation against subordinate
officers who broke the code of silence").
    In a number of cases, our sister circuits have also
recognized the existence of a "code of silence" in law
enforcement.  See, e.g., B.K.B. v. Maui Police Dep't, 276 F.3d
1091, 1096 (9th Cir. 2002) (noting that the plaintiff officer
testified "that during her police academy training, all of the
recruits were taught about the 'code of silence' that functioned
as an unwritten department policy against speaking out against
fellow officers"); Carter v. Morris, 164 F.3d 215, 220 (4th Cir.
1999) (describing police officers' testimony in another case that
a "code of silence" prevented the punishment of officers for the
use of excessive force); Sledd v. Lindsay, 102 F.3d 282, 287 (7th
Cir. 1996) (pointing out that the plaintiff arrestee's complaint
"alleged in considerable detail how the 'code of silence'
operated, [claiming] specifically that the code injured [the
plaintiff] because the officers responsible for using excessive
force and otherwise abusing him had good reason to believe that
their misconduct would not be revealed by their fellow officers
and that they would effectively be immune even if a complaint was
filed"); Meriwether v. Coughlin, 879 F.2d 1037, 1049 (2d Cir.
1989) (affirming the district court's admission of testimony in
which the commissioner of the state department of correctional
services "admitted knowing that corrections officers generally
adhere to a 'code of silence' and lie to conceal other officers'
assaults on prisoners").

49

the public services performed by a law enforcement agency.

Pickering, 391 U.S. at 568.[20]

In fact, enforcing a "code of silence" not only fails to promote the efficiency of a law enforcement agency in carrying out its public duties —— it undermines that efficiency.  One of the primary interests of law enforcement agencies is ensuring that officer misconduct is disclosed and can thus be addressed and prevented in the future.  As this court has recognized, the First Amendment interest in protecting speech about official misconduct is also a governmental interest, and there are circumstances in which that interest outweighs any other governmental interests that may be implicated.  See Wilson v. UT Health Ctr., 973 F.2d 1263, 1270 (5th Cir. 1992) (concluding that if the plaintiff police officer made a sexual harassment report in good faith, then the "interest in maintaining a police force

---

[20]   The Police Chiefs and Sheriffs never protested Kinney's previous expert testimony on the side of law enforcement or argued that such testimony created a conflict of interest. Indeed, the Police Chiefs and Sheriffs have explicitly stated in the record that, in contrast to expert testimony by their training instructors on behalf of plaintiffs in police misconduct cases, the Police Chiefs and Sheriffs do not believe that expert testimony by their training instructors on behalf of law enforcement gives rise to a "conflict of interest."  This viewpoint discrimination by the Police Chiefs and Sheriffs only further convinces us that they did not have any legitimate interest in suppressing Kinney's and Hall's speech.  Cf. Smith, 693 F.2d at 368, overruled on other grounds by Walther v. Lone Star Gas Co., 952 F.2d 119, 126 (5th Cir. 1992) ("To allow a prosecutor to retaliate against trial testimony on the grounds that it was unfavorable to the state would impermissibly restrict the free expression of the witness based on the content of his testimony.").

50

that is free of sexual intimidation, which [such] good faith reports would serve, outweighs any interest in departmental efficiency and harmony"). The instant case involves such circumstances. The governmental and First Amendment interest in protecting Kinney's and Hall's testimony regarding officer misconduct outweighs any interest of the Police Chiefs and Sheriffs in avoiding potential "conflicts of interest," given that the testimony was against a police officer who had never trained at the ETPA and a police department that had no connections to the ETPA.

We have concluded that Kinney's and Hall's testimony was speech of public concern and that the First Amendment interests in that testimony outweigh any governmental interests in this case.[21] Accordingly, because the district court found that

---

[21] Given the case-specific nature of the <u>Pickering</u> inquiry, this case does not present — and thus we do not address — the questions whether a law enforcement agency has legitimate interests in prohibiting its training instructors from serving as expert witnesses against officers who are employed by that agency or whether any such legitimate interests would be outweighed by the First Amendment interest in ensuring that speech about official misconduct is uninhibited. Consequently, <u>Tedder v. Norman</u>, 167 F.3d 1213 (8th Cir. 1999), the Eighth Circuit case relied on by the dissent, has little, if any, bearing on the instant case. The issue in <u>Tedder</u> was whether a state law enforcement training academy violated the First Amendment by terminating a training instructor who testified against an officer who was employed by a law enforcement agency <u>that sent its officers to the academy for training</u>. <u>See</u> <u>id.</u> at 1214-15. As we explain above, it is because Kinney's and Hall's speech was about a police officer who had never been trained by the ETPA and who was employed by a police department that had never enrolled its officers in ETPA courses that we conclude the Police Chiefs and Sheriffs do not have legitimate interests in suppressing that speech and, thus, that the strong First Amendment interest in

51

Kinney and Hall established a genuine factual issue regarding whether the Police Chiefs and Sheriffs boycotted Kinney's and Hall's courses and sought to have them removed from the ETPA faculty because of their testimony, Kinney, 111 F. Supp. 2d at 838, 843, the facts alleged by Kinney and Hall are sufficient to state a First Amendment violation. See supra Subsection IV.B.1.b.

We now turn to the "clearly established" question of qualified-immunity analysis, i.e., whether it would have been apparent to a reasonable officer under law clearly established the time of the alleged violation that the Police Chiefs' and Sheriffs' conduct violated the First Amendment.

> 2. The "clearly established" inquiry: Would it have been apparent to a reasonably competent officer that the alleged conduct violated the First Amendment?

Because the applicable law dictating that the Police Chiefs' and Sheriffs' alleged conduct violated Kinney's and Hall's First Amendment rights to free speech was in existence before October 1998, we have already "set forth principles which will become the basis for [our inquiry into whether] that right [wa]s clearly established" at the time of the alleged violation. Saucier, 121 S. Ct. at 2156. However, our conclusion that the Police Chiefs' and Sheriffs' conduct constituted a First Amendment violation under the controlling law at the time of the alleged violation is

---

speech about official misconduct unquestionably outweighs any governmental interest in the instant case.

52

an important, but not dispositive, consideration in the "clearly established" inquiry. As the Supreme Court has explained, the "clearly established" inquiry is distinct from the inquiry into whether a right was violated "in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Id. (quoting Anderson, 483 U.S. at 640).

There is no question that it was clearly established well before October 1998 that Kinney's and Hall's testimony was of public concern and thus was speech protected by the First Amendment. The Police Chiefs and Sheriffs do not attempt to argue otherwise, but rather suggest that it was not clearly established that the First Amendment imposed any restrictions on their conduct vis-a-vis Kinney and Hall in their capacity as training instructors. The Police Chiefs and Sheriffs point out that there is no controlling caselaw directly addressing a First Amendment claim in the specific circumstances of this case, i.e., where a plaintiff has provided services to the governmental defendant but is neither an employee of the defendant nor in a contractual relationship with the defendant. More specifically, the Police Chiefs and Sheriffs characterize Kinney and Hall as "employees of a 'disappointed bidder' —— i.e., Kilgore College." The Police Chiefs and Sheriffs apparently base this contention in part on the Court's admonishment in Umbehr that "[b]ecause

53

Umbehr's suit concerns the termination of a pre-existing commercial relationship with the government, we need not address the possibility of suits by bidders or applicants for new government contracts who cannot rely on such a relationship." 518 U.S. at 685.

Initially, we reject the implication of the Police Chiefs' and Sheriffs' argument that it would have been reasonable for an officer in their positions to believe that they were completely unfettered by the First Amendment merely because their relationship with Kinney and Hall was non-employment and non-contractual. Both the Supreme Court and this court have explicitly rejected such reasoning. In O'Hare Truck Service, the Court rejected "the proposition . . . that those who perform the government's work outside the formal employment relationship are subject to what we conclude is the direct and specific abridgment of First Amendment rights." 518 U.S. at 720. Similarly, in Blackburn, we stated that the district court's "assumption that only public employees enjoy the protections of the First Amendment" rested on "inverted" reasoning because "[e]very citizen enjoys the First Amendment's protections against governmental interference with free speech." 42 F.3d at 931.[22]

_____

[22] Moreover, the analysis that this court set forth in Blackburn for determining whether a First Amendment claim alleging retaliatory denial of governmental benefits is governed by the "ordinary citizen" or "governmental employee" version of the "unconstitutional conditions" doctrine assumes that one of these two levels of First Amendment scrutiny applies. Blackburn does not leave open the possibility that there are circumstances

54

As we explained in Blackburn, the Supreme Court did not formulate the "governmental employee" version of the "unconstitutional conditions" doctrine in order to limit the applicability of the First Amendment to the public employment context, but rather in order to take into account that "the First Amendment rights of public employees are restricted by the nature of the employer-employee relationship." Id. Indeed, the Court's decisions in Pickering, Umbehr, and O'Hare Truck Service are based on the assumption that although the government may have relationships with individuals in addition to a government/citizen relationship, individuals do not, as a result of such relationships, cease to be citizens with First Amendment rights that the government is obligated to respect.

The Police Chiefs and Sheriffs also incorrectly assume that a decision addressing the specific circumstances of the instant case is a necessary condition of "clearly established" law. "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Saucier, 121 S. Ct. at 2156. As this court has explained, "[t]he term 'clearly established' does not necessarily refer to commanding precedent that is factually on all-fours with the case at bar," but rather is based on the premise that

---

in which a governmental denial of benefits is not subject to any First Amendment restrictions.

55

"officials must observe general, well-developed legal principles."  Doe v. Taylor Indep. Sch. Dist., 15 F.3d 443, 455 (5th Cir. 1994) (en banc) (internal quotations and citations omitted).  In light of our 1995 opinion in Blackburn and the Court's 1996 opinions in Umbehr and O'Hare Truck Service, it was clearly established in October 1998 that if the government's relationship with an individual is sufficiently similar to an employment relationship in terms of the relative interests at stake, a Pickering balance is appropriate.  Otherwise, the general rule is that the government has no more interest in inhibiting the plaintiff's speech than any other citizen's speech, and thus an "ordinary citizen" First Amendment retaliation analysis is appropriate.  See Blackburn, 42 F.3d at 932, 934.

In light of this law that was clearly established in October 1998, it would have been apparent to reasonable officials in the Police Chiefs' and Sheriffs' positions that their attempts to inhibit Kinney's and Hall's speech on matters of public concern were governed by a Pickering analysis.  Kinney and Hall were not nearly as removed from the financial benefit afforded by the Police Chiefs' and Sheriffs' enrollment of their officers in Kinney's and Hall's courses as the Police Chiefs and Sheriffs' "bidder" characterization might suggest.  Neither Kilgore College nor ETPA instructors such as Kinney and Hall were mere "bidders" in the sense that they lacked a "pre-existing commercial

relationship" of the sort that the Court was concerned about in Umbehr — i.e., a relationship that the Police Chiefs and Sheriffs could use to inhibit speech. See 518 U.S. at 674 (reasoning that a Pickering balancing analysis is appropriate in cases involving the government's independent contractors or providers of regular services as well as its employees because both "type[s] of relationship provide[] a valuable financial benefit, the threat of the loss of which in retaliation for speech may chill speech on matters of public concern"). In these circumstances, reasonable officials in the Police Chiefs' and Sheriffs' positions would have understood that they had the power to deny Kinney and Hall significant benefits as ETPA instructors and that it is the existence of that sort of power — and not mere labels describing governmental relationships — that is determinative in First Amendment "denial of benefit" cases. See O'Hare Truck Serv., 518 U.S. at 722 ("Recognizing the distinction [between governmental employees and regular providers of services] would invite manipulation by government, which could avoid constitutional liability simply by attaching different labels to particular jobs."); Umbehr, 518 U.S. at 678-79 (declining to create "a bright-line rule distinguishing independent contractors from employees," reasoning that such a rule "would leave First Amendment rights unduly dependent on whether state law labels a government service provider's contract as a contract for employment or a contract for services, a

57

distinction which is at best a very poor proxy for the interests at stake").

Similarly, the Police Chiefs and Sheriffs had employment-type interests in their relationship with Kinney and Hall. Indeed, the Police Chiefs and Sheriffs persuasively asserted such interests at oral argument. For example, the Police Chiefs and Sheriffs pointed out that the East Texas Police Chiefs' Association founded the ETPA in 1966, that they had been sending their officers to the ETPA for training since then, that they sat on the ETPA's advisory board after the ETPA became a part of Kilgore College, that they worked closely with the training instructors, and that they had a role in designing the ETPA's curriculum. In light of this relationship that the Police Chiefs and Sheriffs had with Kinney and Hall and the controlling Fifth Circuit and Supreme Court precedent at the time of the alleged violation, no reasonable official would have believed that the Police Chiefs' and Sheriffs' use of their relationship with the ETPA to impose restrictions on Kinney's and Hall's freedom to speak on matters of public concern was limited by anything less than a Pickering balancing analysis.

The Police Chiefs and Sheriffs also contend that, even assuming it was clearly established that their conduct vis-a-vis Kinney and Hall was governed by the "governmental employee" version of the unconstitutional-conditions doctrine, it was not clearly established that their conduct violated the First

58

Amendment under a Pickering balancing analysis.  In particular,

the Police Chiefs and Sheriffs note that two Texas policies

denying benefits to state employees who testified as expert

witnesses against the state were in effect in October 1998.  See

Hoover v. Morales, 164 F.3d 221, 223-24 (5th Cir. 1998)

(describing the two policies).[23]  However, reasonably competent

_____

[23]  In Hoover, this court affirmed the district court's
issuance of a preliminary injunction enjoining the state from
enforcing the two policies because we determined them to be
overbroad in violation of the First Amendment.  164 F.3d at 227.
     In arguing that the unlawful nature of the Police Chiefs'
and Sheriffs' conduct was not clearly established at the time of
the alleged violation, the dissent relies heavily on this court's
recognition in Hoover that "there may be occasions when the
State's interest in efficient delivery of public services will be
hindered by a state employee acting as an expert witness or
consultant."  Id.  According to the dissent, "considering that,
at the very time [the Police Chiefs and Sheriffs] were acting,
our court left open the possibility that the government could
legitimately curtail the First Amendment rights of an employee
testifying as an expert witness, it simply cannot be the case
that it is apparent a reasonable official (sheriff or police
chief) would have then known that refusing to send their officers
to teachers who have testified as expert witnesses against law
enforcement would violate those teachers' First Amendment
rights."  This conclusion, however, fails as a matter of logic
because it proves too much.  The fact that we limited our
decision in Hoover to the two policies at issue, which
effectively "prohibit[ed] state employees from acting as
consultants or expert witnesses on behalf of parties opposing the
State in litigation," 164 F.3d at 223, in no way implies that it
would be reasonable for a governmental official to conclude that
any other type of governmental restriction on expert testimony
adverse to another government entirely is consistent with the
First Amendment.  Indeed, such a conclusion is inconsistent with
Pickering, which makes clear that the Pickering balancing
analysis is a case-specific inquiry:
     Because of the enormous variety of fact situations in
     which critical statements by teachers and other public
     employees may be thought by their superiors, against whom
     the statements are directed, to furnish grounds for
     dismissal, we do not deem it either appropriate or
     feasible to attempt to lay down a general standard

59

officials do not look to state law to ascertain the federal law governing their conduct. Moreover, we are not persuaded that the existence of these Texas policies demonstrates that a reasonably competent official might have believed that it was constitutional to deny benefits to individuals because of their expert testimony against the government.

Given (1) that it is well-established in the jurisprudence of both the Supreme Court and this court that exposure of misconduct by a governmental official is of great First Amendment significance, and (2) that this court has repeatedly emphasized the need to protect speech exposing police officer misconduct in particular, it would have been objectively unreasonable for an officer to conclude that Kinney's and Hall's testimony bore no significant weight for purposes of a <u>Pickering</u> balancing analysis.[24]

---

against which all such statements may be judged. However, in the course of evaluating the conflicting claims of First Amendment protection and the need for orderly school administration <u>in the context of this case</u>, we shall indicate some of the general lines along which an analysis of the controlling interests should run.

391 U.S. at 569 (emphasis added).

[24] The Police Chiefs and Sheriffs also suggest that a reasonable officer would not necessarily have understood the First Amendment import of Kinney's and Hall's speech because it was in the form of expert testimony. That Kinney and Hall testified as expert witnesses does not diminish the First Amendment interest in ensuring that the speech is uninhibited. Indeed, we concluded as much in <u>Rainey v. Jackson State College</u>, 481 F.2d 347 (5th Cir. 1973), where we held that the refusal of state university administrators to renew a teacher's contract because he had testified as an expert witness for the defense in

60

Moreover, in light of the law clearly established at the time of the alleged violation, no reasonable official in the Police Chiefs' and Sheriffs' position would have believed that exerting pressure on Kilgore College to remove Kinney and Hall from the ETPA faculty could be justified on the grounds that their testimony created a "conflict of interest" and violated amorphous and questionable "principles" such as "personal loyalty" and "cooperative responsibility."  Whatever interests lie behind these words, no reasonable officer would have believed that they were legitimate interests in the circumstances of this case, much less that any such interest was sufficient to outweigh the strong First Amendment interest in ensuring that individuals such as Kinney and Hall, who are in the best position to know about official misconduct, are not inhibited from testifying as to official misconduct.[25]

---

a criminal trial established "a clear case of impermissibly freighting the [teacher's] contract with a deprivation of the First Amendment right to free speech."  Id. at 350.

[25]  The dissent does not argue that it was not clearly established that the Pickering balancing analysis applied to the Police Chiefs' and Sheriffs' alleged conduct, but rather that it was not clearly established that their conduct violated the First Amendment under that analysis.  In particular, the dissent maintains that "[t]he majority fails to cite a single case rendered prior to the conduct at issue both dealing with a factually analogous situation and deciding that such conduct violates a First Amendment right."  We are convinced that Umbehr and O'Hare Truck Service are two such cases.  Further, even assuming that those two cases are not directly controlling, it is unquestionable that the authority clearly established at the time of the alleged violation dictates (1) that Kinney's and Hall's speech — being in the form of judicial testimony and being about official misconduct — is quintessential "First Amendment" speech

61

Thus, we conclude that the Police Chiefs' and Sheriffs' alleged conduct not only violated a constitutional right, but also, in light of the law clearly established at the time that the conduct occurred, was objectively unreasonable in the particular circumstances of this case.[26]  The district court correctly determined that the Police Chiefs and Sheriffs are not entitled to qualified immunity from Kinney's and Hall's § 1983

---

bearing significant weight for purposes of the Pickering balancing analysis, and (2) that enforcing a code of silence, at least in the circumstances that obtained here, is not a legitimate governmental interest.  Accordingly, viewing the facts in the light most favorable to Kinney and Hall, and presuming that reasonably competent officers "observe general, well-developed legal principles," Doe, 15 F.3d at 455  (citation and internal quotations omitted), we find it manifest that no reasonable officer in the Police Chiefs' and Sheriffs' position at the time of the alleged violation would have determined that it was permissible under the First Amendment to boycott Kinney's and Hall's courses in retaliation for their testimony in an excessive-force case against a police officer who had never trained at the ETPA and a police department that had never enrolled its officers in ETPA courses.

[26]  Contending that we apply the "clearly established" inquiry only to the question whether the Pickering balancing analysis governed the Police Chiefs' and Sheriffs' conduct vis-a-vis Kinney and Hall, but not to the question whether the Police Chiefs' and Sheriffs' conduct violated the First Amendment under that analysis, the dissent maintains that we consequently "conflate[] the qualified immunity inquiry into a decision on the merits —— whether [the Police Chiefs and Sheriffs] violated a constitutional right."  As the foregoing analysis makes clear, however, we conclude that the contours of the law were sufficiently clear at the time of the alleged violation that a reasonable official in the Police Chiefs' and Sheriffs' position would have understood both that Pickering was the governing First Amendment law and that, in the circumstances of the instant case, the First Amendment interests in protecting Kinney's and Hall's expert testimony outweighed any legitimate governmental interests in suppressing that speech.  We do not, as the dissent suggests, conclude merely that the First Amendment interests did in fact outweigh the governmental interests.

claims alleging violations of their rights to freedom of speech under the First and Fourteenth Amendments.

## C.   *The § 1983 Claim Invoking the Right to Due Process of Law Under Fourteenth Amendment*

The district court also denied the Police Chiefs and Sheriffs qualified immunity against Kinney's and Hall's § 1983 claims alleging that the Police Chiefs and Sheriffs violated the Due Process Clause of the Fourteenth Amendment.[27]  Under Supreme Court jurisprudence, the Due Process Clause's protection of an individual's life, liberty, and property has both a procedural and a substantive component.  See County of Sacramento v. Lewis, 523 U.S. 833, 840 (1998).  The procedural component requires states to provide constitutionally adequate procedures before depriving an individual of life, liberty, or property, and the substantive component "bars certain arbitrary, wrongful government actions regardless of the fairness of the procedures used to implement them."  Zinermon v. Burch, 494 U.S. 113, 125 (1990) (internal quotations and citations omitted).  Because "[t]he Due Process Clause is only implicated when a person has a constitutionally protected interest in life, liberty, or property," Conner v. Lavaca Hosp. Dist., 267 F.3d 426, 437 (5th Cir. 2001), such an interest must be established to state a cause of action under both the procedural and the substantive

---

[27]   The Due Process Clause prohibits states from "depriv[ing] any person of life, liberty, or property, without due process of law."  U.S. CONST. amend. XIV, § 1.

63

components of the Clause, see Mahone v. Addicks Util. Dist., 836 F.2d 921, 929 n.8 (5th Cir. 1988).

Although Kinney's and Hall's due process claims are ambiguously pled, it appears that they allege violations of the procedural, rather than the substantive, component of the Clause. In support of their due process claim, Kinney and Hall allege that the Police Chiefs and Sheriffs "blackballed [them] and cost them their jobs without providing any process at all."  More specifically, Kinney and Hall note that the Police Chiefs and Sheriffs "refused to even listen to [them] when Dr. Holda set up a meeting."  However, regardless whether their claim is based on substantive or procedural due process (or both), Kinney and Hall have failed to allege that they have been deprived of a life, liberty, or property interest.

Kinney and Hall contend, and the district court agreed, that they had "property interests in their continued employment at the Academy."  Kinney, 111 F. Supp. 2d at 839.  The property interests protected by the Due Process Clause "'are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law.'" Conner, 267 F.3d at 437 (quoting Bd. of Regents v. Roth, 408 U.S. 564, 577 (1972)).  Under Texas law, "the employment relationship is generally at-will unless the parties enter into an express agreement that provides otherwise."  City of Midland v. O'Bryant, 18 S.W.3d 209, 215 (Tex. 2000).  Because Kinney and Hall had one-

64

year employment contracts, they were not at-will employees. Thus, they had a property interest in their employment as long as one of these contracts was in effect. However, Kinney and Hall apparently do not rely on these contracts as the source of their asserted property interest. Instead, they apparently assert a property interest in their "continued employment," i.e., the renewal of their contracts.[28]

The Police Chiefs and Sheriffs contend that because Kilgore College was not obligated to renew Kinney's and Hall's contracts each year, their continued employment from one year to the next was at-will. Thus, the Police Chiefs and Sheriffs assert, Kinney and Hall had no property interest in their "continued employment" within the meaning of the Due Process Clause. Kinney and Hall do not dispute that their employment from one contract to the next was at-will. Rather, they point to the "unconstitutional-conditions" doctrine, which establishes that "even though a person has no 'right' to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, . . . [i]t may not deny a benefit to a person on a basis that infringes his constitutionally protected interests." Perry,

---

[28]  Kinney continued to work under the contract in effect at the time that the boycott began until that contract expired. Although Hall resigned approximately seven months before his contract would have expired, he, like Kinney, does not allege that he was deprived of a property interest in employment established by that one-year contract, but rather that he was deprived of an interest in continued employment at the ETPA in future years.

408 U.S. at 597.  According to Kinney and Hall, the unconstitutional-conditions doctrine thus prevents the Police Chiefs and Sheriffs from effectively denying Kinney and Hall the benefit of contract renewal on grounds that violate constitutionally protected interests.  However, where the Due Process Clause is the source of constitutional protection invoked, the only property interests that are "constitutionally protected" are those that are created by some independent source, such as state law.

Kinney and Hall do not allege that their continued employment at the ETPA was a property interest derived from state law or some other source independent of the Constitution. Accordingly, for the purpose of this appeal, we assume without deciding that Kinney and Hall have not asserted a property interest established by state law or some similarly independent source.  In the absence of such an assertion, their alleged "property interests" in continued employment are not sufficient to trigger the protections of the Due Process Clause.

Because we conclude that Kinney and Hall have not stated a violation of their Fourteenth Amendment right to due process of law, we need not engage in the "clearly established" inquiry of qualified-immunity analysis.[29]  Accordingly, we reverse the

---

[29]  At oral argument, Kinney and Hall appeared to suggest that the Police Chiefs' and Sheriffs' "blackballing" and the resulting harm to their professional reputations may somehow render their property interest adequate for purposes of the Due Process Clause.  However, in Paul v. Davis, 424 U.S. 693 (1976),

66

district court's summary judgment order denying the Police Chiefs and Sheriffs qualified immunity from Kinney's and Hall's § 1983 due process claims.

## V. TEXAS LAW "OFFICIAL IMMUNITY"

Finally, the district court denied the Police Chiefs and Sheriffs "official immunity" against Kinney's and Hall's state-law claims of tortious interference with business relations. "[O]rders premised on the denial of qualified immunity under Texas state law are appealable in federal court to the same extent as district court orders premised on the denial of federal law immunity." Cantu v. Rocha, 77 F.3d 795, 804 (5th Cir. 1996). Accordingly, we have supplemental jurisdiction over the legal questions presented by the Police Chiefs' and Sheriffs' appeal of the district court's denial of state law immunity. See id.; see also supra Part II.

Texas law provides government officials with "official immunity from suit arising from the performance of their (1) discretionary duties in (2) good faith as long as they are (3) acting within the scope of their authority." City of Lancaster v. Chambers, 883 S.W.2d 650, 653 (Tex. 1994). It is undisputed that the Police Chiefs and Sheriffs had authority to decide where and by whom their respective agencies' officers were trained, and

the Supreme Court held that an interest in "reputation," at least when unaccompanied by deprivation of a property or liberty interest grounded in state law, does not amount to a liberty or property interest protected by the Due Process Clause. See id. at 701, 711-12.

that such decisions were among the Police Chiefs' and Sheriffs' discretionary duties. The issue in contention is whether they acted in good faith in refusing to enroll their officers in Kinney's and Hall's courses. See Kinney, 111 F. Supp. 2d at 844.

The "good faith" standard established by the Texas Supreme Court "is derived substantially from the test that has emerged under federal immunity law for claims of qualified immunity." Chambers, 883 S.W.2d at 656. Like qualified immunity, the good-faith standard focuses on the objective legal reasonableness of the officer's conduct. Officers are presumed to have acted in good faith if they are able to show that a reasonably prudent officer in the same or similar circumstances could have believed that the conduct in question was justified. Id. at 656-67. To rebut this presumption of good faith, "the plaintiff must show that no reasonable person in the defendant's position could have thought the facts were such that they justified defendant's acts." Id. at 657 (internal quotations omitted). However, Texas law official immunity differs from qualified immunity in that the good-faith test does not depend on whether the right was clearly established at the time of the alleged violation. Id.

The Police Chiefs and Sheriffs argue that they acted in good faith because "a reasonable officer could have believed that expressing his concerns to Dr. Holda and changing the training of his officers to meet those concerns was reasonable." However, in applying the good-faith test of official immunity, Texas courts

assume the plaintiff's version of the facts to be true. O'Bryant v. City of Midland, 949 S.W.2d 406, 412 (Tex. App.–Austin 1997), rev'd on other grounds, 18 S.W.3d 209, 216 (Tex. 2000). Thus, the Police Chiefs and Sheriffs must show that a reasonable officer could have believed that denouncing Kinney and Hall in various communications to Holda (by letter as well as in person) and boycotting Kinney's and Hall's courses were justified because of their expert testimony against law enforcement. The Police Chiefs and Sheriffs have failed to make such a showing. For the reasons that we stated above in determining that the Police Chiefs and Sheriffs are not entitled to qualified immunity against Kinney's and Hall's free speech claims, we conclude that no reasonable officer in the Police Chiefs' and Sheriffs' position could have believed that the alleged conduct was justified. The district court correctly denied the Police Chiefs and Sheriffs official immunity from Kinney's and Hall's state tort claims.

## V. CONCLUSION

For the foregoing reasons, we AFFIRM the district court's summary judgment denying the Police Chiefs and Sheriffs qualified immunity from Kinney's and Hall's § 1985(2) claims, their § 1983 claims invoking their rights to freedom of speech, and their state tort claims. However, we REVERSE the district court's denial of qualified immunity on Kinney's and Hall's § 1983 claims invoking their Fourteenth Amendment rights to due process of law.

69

Finally, as explained above, we DISMISS the appeals of the cities, counties, and East Texas Police Chiefs' Association.[30] Accordingly, we REMAND the case to the district court for entry of judgment in favor of the Police Chiefs and Sheriffs on the § 1983 due process claims and for trial on the remaining claims. The Police Chiefs and Sheriffs (the individual Defendants-Appellants) shall bear the costs of this appeal.

---

[30] See supra, note 7.