REVISED OCTOBER 27, 2008

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

June 27, 2008

Charles R. Fulbruge III
Clerk

No. 06-41648

GREGORY MOORE

Plaintiff–Appellee

V.

CHARLES D LIGHTFOOT, Major of Correctional Officers–Beto One Unit Classification; J P GUYTON, State Classification Committee

Defendants–Appellants

Appeal from the United States District Court
for the Eastern District of Texas
USDC No. 6:03-CV-82

Before JOLLY, BARKSDALE, and BENAVIDES, Circuit Judges.

PER CURIAM:[*]

On January 8, 2002, Appellee Gregory Moore, an inmate currently incarcerated by the Texas Department of Criminal Justice, Correctional Institutional Division ("TDCJ-CID"), was assaulted by Clifton Holiday, another inmate at TDCJ-CID. On February 23, 2003, Moore brought a § 1983 action against various prison officials, including Appellants Charles Lightfoot and J.P.

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

Guyton. Lightfoot and Guyton each moved for summary judgment on the basis of qualified immunity, which the district court denied on October 11, 2006. Appellants filed this interlocutory appeal. For the following reasons, we REVERSE the district court's denial of qualified immunity to Lightfoot and Guyton, and we REMAND with direction that the district court enter its order dismissing Moore's § 1983 claims.

I.

Moore, a twice-convicted child molester, is currently an inmate incarcerated by TDCJ-CID. On May 27, 2002, an unknown TDCJ-CID guard posted a message on an unofficial TDCJ-CID internet bulletin board urging reprisals against sex offenders. In September, certain officers distributed a list of sex offenders to inmates in the Beto I Unit, where Moore was then housed. On October 2, there were several assaults against inmates in the Beto Unit who were either sex offenders or had been labeled "snitches." Consequently, TDCJ-CID instituted a lockdown of Beto Unit.[1]

Shortly after lockdown commenced, Moore began receiving threats from other inmates and thereupon submitted his first life endangerment claim.[2] Specifically, Moore complained that "inmate Richard Tidwell had instituted a

---

[1] Moore's wing of Beto Unit was under lockdown from October 2 to November 4, 2002.

[2] TDCJ-CID has a procedure to investigate and evaluate life endangerment claims. The complaint is first logged with the unit classification office in the offender protection log. The complaint is then assigned to a ranking officer to conduct an investigation, which, when completed, is returned to the unit classification office. The unit classification office then sets the claim for a hearing before the next available Unit Classification Committee ("UCC").

A UCC consists of three voting members, who review and make recommendations regarding an inmate's custodial classification while at the unit. A recommendation to change an inmate's classification requires a majority vote. The UCC may recommend a housing change, placement in safekeeping, placement in protective custody, or a unit transfer. The State Classification Committee ("SCC") has to approve the UCC's recommendations regarding safekeeping, protective custody, and unit transfers. Even in the face of an SCC denial, prison officials with the rank of Major, such as Lightfoot, have the power to assign inmates to transient housing or move them to safer parts of the unit.

plan to eliminate all sex offenders on the Beto Unit and that inmates Tidwell, [Benton] Morgan, and Clifton Holiday were among the group involved." Moore v. Cockrell, No. 6:03-CV-82, slip op. at 3 (E.D. Tex. Oct. 11, 2006). Moore also complained that he overheard inmates Holiday and Morgan saying that Moore was on their "hit list." Moore was thereupon moved to another wing of Beto Unit and placed in transient housing.[3]

On October 11, Moore informed Captain Smith that he was in danger because he was a sex offender and had been labeled a "snitch." When he returned from his interview with Captain Smith, he overheard inmates Morgan and Robert Leifester say that because Moore had snitched, they were going to "take care of him."

On October 12, an investigation of Moore's life endangerment claim was opened. On October 16, the Unit Classification Committee ("UCC"), which included Lightfoot as chairman, reviewed the investigation, voted to put Moore in transient housing, and recommended a unit transfer.

Also on October 16, Morgan and Leifester made additional death threats to Moore. Furthermore, Tidwell told Moore that Lightfoot had said that: "Moore and others had snitched on [Tidwell]" and that "Moore had said [to prison officials] that Tidwell and other inmates were part of a group trying to rid the Beto Unit of sex offenders." Moore, No. 6:03-CV-82, slip op. at 4.

The UCC forwarded the unit transfer request to the State Classification Committee ("SCC"). Guyton, an SCC member, reviewed the request, which he denied on October 24. Although Guyton received credible information from the UCC that Moore was in danger, including the names of the inmates posing a threat to him, Guyton concluded that Moore's claims were uncorroborated. On

---

[3] Prisoners assigned to transient housing are placed in a secured building-wing away from general population. Additionally, such prisoners are single celled and are escorted by a prison guard when out of their cell.

October 25, however, Guyton decided to transfer Tidwell off Beto Unit, which occurred on October 29. Guyton did not transfer Morgan or Holiday off the unit.

After receiving Guyton's denial, on October 28, a UCC chaired by Lightfoot informed Moore that his request for a transfer had been denied and voted to release him into general population beginning on November 5.

On November 5, Moore refused to return to general population, despite the order to do so. He informed Lightfoot of the additional threats he had received after the October 16 hearing, none of which were considered by the SCC. Lightfoot told Moore to "get with one of his ranking officers" and resubmit his life endangerment complaint. Moore's refusal to return to general population resulted in a disciplinary action against him, but a life endangerment investigation was ordered the next day. Consequently, Moore remained in transient housing. On November 13, a different UCC, composed of three non-defendants, denied Moore's life endangerment claim and ordered Moore to be released to general population.

Undeterred, Moore thereafter immediately filed a grievance asking that he be transferred, which prison officials treated as a third life endangerment claim. On November 14, another UCC, also composed of non-defendants, recommended that Moore be transferred. According to Moore, Guyton received this recommendation from the UCC. On December 2, the SCC transferred inmates Tidwell, Dustin Dixon, Leifester, Morgan, and Wheeler off the Beto Unit for harassing and retaliating against sex offenders at the unit.[4] Holiday, however, was not transferred. Thereafter, the SCC denied the recommended transfer request for Moore "because the alleged enemies had been reassigned." Moore, No. 6:03-CV-82, slip op. at 6.

---

[4] The district court states that Tidwell was transferred off Beto Unit at this time. Moore, No. 6:03-CV-82, slip op. at 6. However, it appears that the district court later credited Guyton's assertion that Tidwell was transferred off Beto Unit on October 29. Id. at 24-25.

On December 23, a UCC chaired by Lightfoot informed Moore that the SCC had once again denied his transfer request and voted to return him to general population. Moore then requested that he at least be placed on the south end of the unit, where sex offenders were not receiving the same types of threats, but Lightfoot refused.

Prison officials placed Moore back in general population that same day, and he immediately began to receive death threats, which he reported to prison officials. Specifically, Moore alleges that he saw Holiday at the dining hall, who said, "Yeah, Moore, we're going to get you." On January 2, 2003, Moore submitted a grievance, and a fourth life endangerment investigation was subsequently opened. On January 8, Moore met with two prison officials, who told Moore that they could place him in transient housing but that the UCC would deny a unit transfer and return him to general population. Moore alleges that, as a result of the conversation, "he felt threatened and coerced into waiving his life endangerment claim." Moore, No. 6:03-CV-82, slip op. at 8. Consequently, Moore signed a waiver of his claim and request for a unit transfer. This fourth life endangerment claim was never submitted to the UCC.

That evening, on January 8, Moore was assaulted by Holiday, sustaining physical injury. After the fight, Moore was placed in transient housing and another life endangerment investigation was opened. The UCC hearing the investigation recommended–and the SCC approved–Moore's transfer from Beto Unit.

On February 23, 2003, Moore brought this § 1983 suit against numerous prison officials for failing to protect him in violation of his Eighth Amendment rights. Since Moore filed his First Amended Complaint, all the defendants other than Lightfoot and Guyton have been dismissed. On April 5, 2004, and May 11, 2006, Lightfoot and Guyton, respectively, moved for summary judgment on the basis of qualified immunity. On October 11, 2006, the district court denied in

5

part their motions for summary judgment, concluding that they were not entitled to qualified immunity. Lightfoot and Guyton now appeal.

## II.

Because this is an interlocutory appeal from a denial of summary judgment on the basis of qualified immunity, our jurisdiction is "significantly limited" and "extends to such appeals only 'to the extent that [the denial of summary judgment] turns on an issue of law.'" Kinney v. Weaver, 367 F.3d 337, 346 (5th Cir. 2004) (en banc) (quoting Mitchell v. Forsyth, 472 U.S. 511, 530 (1985)) (alteration in original). We may, therefore, consider "the purely legal question whether the defendants are entitled to qualified immunity on the facts that the district court found sufficiently supported in the summary judgment record." Kinney, 367 F.3d at 347. We do not, however, have jurisdiction to "challenge the district court's assessments regarding the [factual] sufficiency of the evidence–that is, the question whether there is enough evidence in the record for a jury to conclude that certain facts are true." Id.

## III.

Determining whether an official is entitled to qualified immunity is a two-step process. See Thompson v. Upshur County, 245 F.3d 447, 457 (5th Cir. 2001). First, we must determine "whether the plaintiff has alleged the violation of a clearly established federal constitutional (or federal statutory) right." Id. If so, the second step requires us to "assess whether the defendant's conduct was objectively reasonable in light of clearly established law." Id. "The touchstone of this inquiry is whether a reasonable person would have believed that his conduct conformed to the constitutional standard in light of the information available to him and the clearly established law." Goodson v. City of Corpus Christi, 202 F.3d 730, 736 (5th Cir. 2000).

IV.

It is well settled that the Eighth Amendment's proscription against cruel and unusual punishment requires prison officials to protect inmates from violent attacks by other inmates. Farmer v. Brennan, 511 U.S. 825, 833 (1994). To succeed on an Eighth Amendment failure-to-protect claim, "the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm" and that the prison official acted with "deliberate indifference" to the inmate's health or safety. Id. at 834. A prison official is deliberately indifferent if he "knows of and disregards an excessive risk to inmate health or safety"–that is, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id. at 837. A prison official, however, may avoid liability if he "responded reasonably to the risk, even if the harm ultimately was not averted." Id. at 844.

V.

A. Appellant Guyton

Moore alleges that Guyton violated his clearly established Eighth Amendment rights by twice disregarding UCC recommendations to transfer him off Beto Unit and directing him to be placed back into general population with his would-be attacker. Moore asserts, and the district court found sufficient evidence, that Guyton knew that Moore was in danger, chose to disregard this information, did not conduct an independent investigation or request more information from the unit, and simply directed that Moore be placed back into general population with inmates that continued to represent a threat. Thus, Moore alleged that Guyton was deliberately indifferent to a substantial risk of serious harm and thereby alleged a constitutional violation.

Under the second prong of the qualified immunity test, however, we find that Guyton's actions were objectively reasonable in light of clearly established

law. Guyton took measures to protect Moore from danger. In response to Moore's first life endangerment claim, Guyton transferred Tidwell off Beto Unit. Guyton asserts that he took this action rather than transferring Moore because it was logistically simpler to move Tidwell rather than all the sex offenders Tidwell was allegedly harassing. Additionally, because Tidwell was the leader of the gang harassing sex offenders, Guyton hoped that his transfer would discourage other members of the gang and end the matter. Furthermore, Guyton denied Moore's requested transfer a second time only after the SCC had transferred Dixon, Leifester, Morgan, and Wheeler–who were harassing and retaliating against sex offenders–off Beto Unit. Although Holiday remained in general population when Guyton denied Moore's transfer requests, Guyton's actions–although ultimately unsuccessful–"may well have been reasonable methods of addressing the risk that [Moore] faced." Johnson v. Johnson, 385 F.3d 503, 526 (5th Cir. 2004) (stating that actions such as "ordering further investigation or separating Johnson from a particular inmate who had been threatening him" may have been reasonable responses to Johnson's complaints of rape and torture by prison gangs); see also Hare v. City of Corinth, 135 F.3d 320, 328-29 (5th Cir. 1998) (finding that the defendant prison official was entitled to qualified immunity on a deliberate indifference claim because the protective measures he took–while unsuccessful–were "within the parameters of objective reasonableness"). Because Guyton's actions may well have been reasonable, a reasonable official in Guyton's position would not have known that his conduct might be constitutionally infirm. Guyton is, therefore, entitled to qualified immunity.

B. Appellant Lightfoot

Moore first asserts that Lightfoot violated his clearly established Eighth Amendment rights because, as a member of the UCC on October 28, 2002, and December 23, 2002, Lightfoot voted to return Moore to general population.

Moore asserts, and the district court found, that Lightfoot twice voted to return Moore to general population despite knowing that Moore faced a serious risk of substantial harm there. Thus, as with Guyton, Moore has alleged an Eighth Amendment violation.

Lightfoot, however, like Guyton, took some measures in response to Moore's complaints. On October 16, 2002, in response to Moore's first life endangerment claim, Lightfoot, as the UCC chairman, voted to place Moore in transient housing and recommended that Moore be transferred from Beto Unit. Although Lightfoot thereafter twice voted to return Moore to general population where inmate Holiday remained, Lightfoot did so only after the SCC first decided to transfer Tidwell, who was the supposed gang leader, and then after four other threatening inmates were transferred from the unit.[5] Like Guyton, such a response may very well have been reasonable, and clearly established law did not indicate that it was objectively unreasonable. Given that the SCC decided to separate several threatening inmates from Moore (including the alleged gang leader) before Lightfoot ultimately forced Moore to return to general population, a reasonable official in Lightfoot's position would not have known that such action could violate Moore's constitutional rights. Lightfoot is thus entitled to qualified immunity on this claim.

Moore also asserts that Lightfoot violated his Eighth Amendment rights by telling Tidwell that Moore had "snitched" on Tidwell. Moore's only evidence of Lightfoot's statement is contained in Moore's affidavit, which states that Tidwell told Moore about Lightfoot's statements to Tidwell. The district court

---

[5] It is unclear from the district court's findings and the record whether Lightfoot actually knew that Guyton decided to transfer Tidwell off Beto Unit on October 25. However, it appears from the district court's findings and the record that Lightfoot's December 23 UCC was aware of the transfers of the four threatening inmates (and Tidwell) off Beto Unit. See Moore, No. 6:03-CV-82, slip op. at 6, 19. The UCC's December 23 decision was the operative decision that ultimately forced Moore back into general population, and this decision was made with knowledge of all the relevant facts.

found that, if Lightfoot actually did make this statement, "this could be an act of deliberate indifference to his safety." Moore, No. 6:03-CV-82, slip op. at 23. However, even if it is true that Lightfoot made such statements to Tidwell, Moore cannot make out a constitutional claim against Lightfoot. There is no allegation or evidence that Tidwell ever told Holiday about Lightfoot's statements, and given that Moore was already targeted by Tidwell's gang and had been labeled a "snitch,"[6] see id. at 2-3, there is nothing in Moore's allegations or evidence to indicate that Lightfoot's statements caused Moore any injury. Thus, because Moore has failed to state a constitutional violation with respect to this claim and provide any evidence that Lightfoot's statements harmed Moore, Lightfoot is entitled to qualified immunity and summary judgment. See Umar v. Burkett, 996 F.2d 304, 1993 WL 241481, at *2 (5th Cir. 1993) (finding that a claim of deliberate indifference did not "rise to the level of a constitutional violation because . . . [the plaintiff] suffered no injury").

## VI.

For the foregoing reasons, we REVERSE the district court's denial of qualified immunity to Lightfoot and Guyton, and we REMAND with direction that the district court enter its order dismissing Moore's § 1983 claims.

---

[6] On October 11, 2002, Moore told Captain Smith that he had been labeled as a "snitch," and subsequently heard Leifester and Morgan "saying that they were going to 'take care of him' because he had snitched." Moore, No. 6:03-CV-82, slip op. at 3. Lightfoot, however, did not hear Moore's complaints about Tidwell and his gang until five days later on October 16, 2002.